Betty R. BYRD, Plaintiff,

v.

Jack HOPSON; Barbara Hopson; Cynthia Hopson; Holger C. Nelson; Kenneth R. Fox, in his individual capacity and as Sheriff of Mitchell County; and Donald Street, in his individual capacity and as Deputy Sheriff of Mitchell County, Defendants.

No. CIV. 1:02CV212.

United States District Court,
W.D. North Carolina,
Asheville Division.

May 23, 2003.

William Isaac Diggs, Christopher S. Danielsen, Stuart Axelrod, Diggs Danielsen, LLC, Myrtle Beach, SC, for plaintiff.

Andrew J. Santaniello, Cogburn, Goosmann, Brazil & Rose, P.A., Asheville, NC, Dennis L. Howell, Burnsville, NC, C. Frank Goldsmith, Jr., Goldsmith & Goldsmith, Marion, NC, Douglas R. Vreeland, Womble, Carlyle, Sandridge and Rice, Winston–Salem, NC, Scott D. MacLatchie, Womble, Carlyle, Sandridge & Rice, Charlotte, NC, for defendants.

### MEMORANDUM OF OPINION

THORNBURG, District Judge.

**THIS MATTER** is before the Court on the Plaintiff's motion to continue the trial and to deviate from the scheduling order.

By Memorandum and Order filed March 7, 2003, the undersigned required the Defendants to file briefs in support of their motions to dismiss within 15 days of entry of the Order, *i.e.,* on or before March 24, 2003. The Memorandum and Order also provided that the Plaintiff should file responses to those briefs on or before 15 days thereafter, *i.e.,* April 8, 2003. The Pretrial Order and Case Management Plan entered on November 2, 2002, imposed a discovery deadline of March 21, 2003, a deadline which was extended as to depositions only by the March 7, 2003, Memorandum and Order. Motions for summary judgment were to be filed no later than April 4, 2003. The case was set for trial for the June 2003 calendar, however, that deadline was subsequently amended by the Court and reset for the July 2003 calendar. The Plaintiff's motion to amend these deadlines was filed on April 17, 2003.

The following matters are currently pending:

1. Defendant Nelson's motion to dismiss, to which response was filed by the Plaintiff on April 7, 2003;

2. Defendant Cynthia Hopson's motion to dismiss, to which response was filed on April 7, 2003;

3. The motion of Defendants Fox and Street, filed April 4, 2003, to strike the complaint or, in the alternative, to compel responses to discovery, to which no response has been filed;

4. The motion for summary judgment of Defendants' Fox and Street, filed April 4, 2003, to which a response was filed on April 23, 2003;

5. Defendant Cynthia Hopson's motions for sanctions and to compel discovery, filed April 4, 2003, to which no responses have been filed;

6. Defendant Cynthia Hopson's motion for summary judgment, filed April 4, 2003, to which response was filed on April 23, 2003;

7. Defendant Nelson's motion for summary judgment, filed April 4, 2003, to which a response was filed on April 23, 2003; and

8. The motion for summary judgment of Defendants Jack and Barbara Hopson, filed April 4, 2003, to which a response was filed on April 7, 2003.

Before ruling on the motion for an extension of time, the Court will address those matters which are ripe for disposition.

## I. THE ALLEGATIONS OF THE COMPLAINT

Plaintiff's complaint bases federal jurisdiction on causes of action pursuant to 42 U.S.C. §§ 1983, 1985, and 18 U.S.C. § 1964. She also alleges state law claims. According to the allegations of the complaint, in early 2000, Defendant Cynthia Hopson (Cynthia) had an affair with the Plaintiff's husband, not out of an emotional attachment to him but in order to gain access to the Plaintiff's wealth. Complaint, at 3. In furtherance of that plan, Cynthia hired Defendant Nelson to kill the Plaintiff. *Id.* On May 1, 2000, Plaintiff and her husband met surveyors at Elk Wallow Mountain in Mitchell County, North Carolina. Plaintiff, who left the meeting alone in her car, was allegedly beaten by Nelson and left for dead. *Id.*, at 4. Plaintiff alleges that Defendant Fox, the Mitchell County Sheriff, refused to investigate this and later incidents because the Plaintiff stopped contributing to his political campaign. *Id.*

Defendant Street, a Mitchell County Deputy Sheriff, is alleged to have "also" had a "special relationship" with Cynthia. *Id.*, at 5. The obvious innuendo is that Cynthia was involved with both the Plaintiff's husband and the Deputy Sheriff at the same time. Street is alleged to have assaulted the Plaintiff during a hearing conducted in state court. *Id.*, at 7–8. Defendants have clarified in their answers that Plaintiff sued Cynthia in state court for alienation of affection. During a July 2002 hearing in connection with that action, the trial court received information that the Plaintiff had a weapon on her person and ordered that everyone in the courtroom should be searched. *Id.* Plaintiff alleges that during the search of her person by Deputy Street, he used such excessive force that he injured her leg which, as a result, "may require [ ] amputation …." *Id.* After leaving the courthouse, Plaintiff had dinner with her attorney. Plaintiff's Objections to Magistrate's Recommendation, filed January 16, 2003, at 6. At approximately 9:00 PM that evening, she received treatment at Spruce Pine Community Hospital for a right knee injury which she reported occurred when she "ran into [a] door …." *Id.*, at Exhibit G, Triage/Nursing Assessment, Spruce Pine Community Hospital, dated July 24, 2002.

The alienation of affection action was ultimately dismissed with prejudice and Plaintiff was ordered to pay Cynthia's attorneys' fees. The North Carolina Supreme Court refused to review the decision. *Byrd v. Hopson*, — N.C. —, 570 S.E.2d 499 (2002).

Subsequently, Cynthia filed for bankruptcy protection and was required to attend a hearing in January 2002 of the United States Bankruptcy Court at the United States Courthouse in Asheville, North Carolina. Because of the alienation of affection action, Cynthia had listed Plaintiff as a creditor and, as a result, Plaintiff attended the hearing as well. Complaint, at 6. Plaintiff alleges that Defendant Street improperly transported

Cynthia to the hearing in a Sheriff's patrol car and escorted her to and from the hearing. *Id.* Plaintiff alleges that Sheriff Fox knew that Street was providing "special favors" to Cynthia, but did nothing about the situation. *Id.* In addition, Sheriff Fox failed to investigate numerous break-ins, vandalism and harassing phone calls occurring at the Plaintiff's home. *Id.*

As for the Plaintiff's civil "RICO"[1] action, Cynthia works at her parents' business, Hopson's Store. According to the complaint, the Hopson's operate illegal gambling and drug trafficking businesses from the store. *Id.,* at 11. The proceeds from these illegal ventures were used to pay Nelson to kill the Plaintiff and to pay Fox and Street to deprive Plaintiff of her constitutional rights. *Id.,* at 12.

In addition to the "federal" claims, Plaintiff alleges common law conspiracy because Cynthia's parents watched the store while Cynthia and Plaintiff's husband went upstairs in the store to "engage in adulterous acts ...." *Id.,* at 13. An allegation of assault and battery is also made against Cynthia and Nelson as well as a claim for intentional infliction of emotional distress against Cynthia. *Id.,* at 16–17.

## II. THE MOTIONS TO DISMISS

### A. Defendant Nelson's Motion

Defendant Nelson has moved pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the two claims brought against him, common law conspiracy and assault and battery, because they are time-barred.

In ruling on a motion pursuant to Rule 12(b)(6) to dismiss for failure to state a claim, the court must "accept the factual allegations in the Plaintiff['s] complaint and must construe those facts in the light most favorable to the Plaintiff[ ].... [Dis-missal may occur] only if it appears beyond doubt that the Plaintiff[ ] can prove no set of facts in support of [her] claim that would entitle [her] to relief." *Flood v. New Hanover County,* 125 F.3d 249, 251 (4th Cir.1997); Shepard's, *Motions in Federal Court,* § 5.124, at 367 (2d ed.1991). Conclusory allegations are examined in light of the factual claims. *Id.* Nonetheless, dismissal is appropriate if " 'it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be provided in support of [her] claim.' " *Mylan Lab., Inc. v. Matkari,* 7 F.3d 1130, 1134 n. 4 (4th Cir.1993) (quoting *Rogers v. Jefferson–Pilot Life Ins. Co.,* 883 F.2d 324, 325 (1989)) (other citations omitted).

Although a motion pursuant to Rule 12(b)(6) invites an inquiry into the legal sufficiency of the complaint, not an analysis of potential defenses to the claims set forth therein, dismissal nevertheless is appropriate when the face of the complaint clearly reveals the existence of a meritorious affirmative defense. "A complaint showing that the statute of limitations has run on the claim is the most common situation in which the affirmative defense appears on the face of the pleading[.]"

*Brooks v. City of Winston–Salem, N.C.,* 85 F.3d 178, 181 (4th Cir.1996) (quoting 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure,* § 1357, at 352 (1990)). This Court has not been loathe to dismiss claims which are time-barred on the face of the complaint. *See, e.g., Plimpton v. Cooper,* 141 F.Supp.2d 573 (W.D.N.C.), *aff'd,* 21 Fed.Appx. 159 (4th Cir.2001); *Morley v. N.C. Dep't HHS/Broughton Hosp.,* 171 F.Supp.2d 585 (W.D.N.C.2001).

---

**1.** Title 18 U.S.C. § 1964 provides a civil cause of action for injury to business or property as a result of a Racketeer Influenced and Corrupt Organization.

■ Prior to October 1, 2001, the North Carolina statute of limitations for bringing an action alleging assault and/or battery was one year from the time of the accrual of the claim. N.C. Gen.Stat. § 1–54(3) ("Session Laws 2001–175, s.1, effective October 1, 2001, and applicable to claims arising on or after that date, substituted 'libel and slander' for 'libel, slander, assault [and] battery . . . ."). The statute of limitations on an assault in North Carolina begins to run on the date of the assault. *Jennings v. University of North Carolina at Chapel Hill*, 240 F.Supp.2d 492 (M.D.N.C.2002). The statute of limitations on a battery in North Carolina begins to run as of the date of the battery. *Estate of Fennell v. Stephenson*, 354 N.C. 327, 332, 554 S.E.2d 629, 632 (2001). Plaintiff alleges that Nelson inflicted assault and battery on her by virtue of the May 1, 2000, incident.[2] "[T]he plaintiff's claim lies solely in assault and battery and is barred by the one year statute of limitations." *Britt v. Hayes*, 142 N.C.App. 190, 194, 541 S.E.2d 761, 763 (2001).

■ The only other claim stated against Defendant Nelson is the common law claim for conspiracy arising from the alleged conspiracy to assault and batter the Plaintiff. However, in North Carolina, there is no independent cause of action for civil conspiracy; the claim can arise only where there is an underlying claim for unlawful conduct. *Toomer v. Garrett*, —— N.C.App. ——, 574 S.E.2d 76 (2002), *appeal dism.*, 357 N.C. 66, 579 S.E.2d 576 (2003); *Henry v. Deen*, 310 N.C. 75, 87, 310 S.E.2d 326, 334 (1984). Thus, where the underlying claim has been dismissed, the civil conspiracy claim must also be dismissed. *Gray v. Laws*, 915 F.Supp. 762 (E.D.N.C.1994), *aff'd in part, vacated in part on other grounds*, 51 F.3d 426 (4th Cir.1995).

■ In addition, "[t]here is not a specific limitations period for civil conspiracy, however, the action must be brought within the time period corresponding to the limitation period applicable to the allegedly unlawful acts underlying the conspiracy." *Liner v. DiCresce*, 905 F.Supp. 280, 290 (M.D.N.C.1994) (citing *Dickens v. Puryear*, 302 N.C. 437, 276 S.E.2d 325 (1981)). Since the time period corresponding to assault and battery has expired, any action based on civil conspiracy is also time-barred. *Id.; accord, In re Broughton*, 25 F.3d 1038 (table), 1994 WL 202288, at *3 (4th Cir.1994). As a result, Defendant Nelson's motion to dismiss must be granted.[3]

**B. Defendant Cynthia Hopson's motion**

For the same reasons as stated *infra*, the cause of action against Cynthia Hopson for assault and battery is time-barred and must be dismissed. To the extent that the civil conspiracy cause of action relies

---

**2.** Citing an Ohio case, Plaintiff argues that the statute of limitations does not begin to run until she, as the victim, became aware of the identity of her attacker. During her deposition, Plaintiff admitted that since June 2001 she was aware that Nelson had been identified as the attacker. Deposition of Betty R. Byrd, at 123–24. Assuming *arguendo* that the time began to run from that date, this action was not begun until September 16, 2002, more than one year later.

**3.** In her response to the motion to dismiss, Plaintiff argues that the conspiracy claim in the complaint relates to a conspiracy to intentionally inflict emotional distress, not a conspiracy to commit assault and battery. However, the claim for intentional infliction of emotional distress is alleged only as to Cynthia Hopson. For the same reasons as stated herein, no claim for conspiracy to inflict emotional distress has been alleged as to Nelson.

on that underlying claim, it is also time-barred.[4]

## III. THE MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is appropriate if there is no genuine issue of material fact and judgment for the moving party is warranted as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue exists if a *reasonable* jury considering the evidence could return a verdict for the nonmoving party, here the Plaintiff. *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)) (emphasis added). Thus, the Defendant as the moving party has the initial burden to show a lack of evidence to support Plaintiff's case. *Shaw, supra* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If this showing is made, the burden then shifts to the Plaintiff who must convince the Court that a triable issue does exist. *Id.* Such an issue will be shown "if the evidence is such that a reasonable jury could return a verdict for the [Plaintiff]." *Id.* A "mere scintilla of evidence" is not sufficient to defeat summary judgment. *Id.* Moreover, in considering the facts for the purposes of this motion, the Court will view the pleadings and material presented in the light most favorable to the Plaintiff, as the nonmoving party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### A. Defendant Cynthia Hopson's Motion for Summary Judgment

The claims remaining against Cynthia Hopson are a civil violation of the RICO statute, conspiracy pursuant to §§ 1983 and 1985 and intentional infliction of emotional distress. Cynthia has moved for summary judgment based on the discharge in bankruptcy of any claims against her, *res judicata*, collateral estoppel, and failure to make out *prima facie* cases.

Title 18 U.S.C. § 1964(c) provides a civil cause of action for "[a]ny person injured in [her] business or property by reason of a violation of section 1962 . . . ." Plaintiff's complaint makes the following allegations in support of her private RICO claim:

[The Hopson's] have directly and[/]or indirectly conspired to conduct . . . the affairs of Hopson's Store in a manner which constitutes a pattern of racketeering activity . . . . Such activity includes . . . using the location . . . to solicit the murder for hire of the Plaintiff and to plan and monitor the progress of the murder for hire scheme . . . .

. . . . .

Hopson used proceeds from the illegal sale of drugs and related racketeering activities, (a) to pay Nelson to murder the Plaintiff; and (b) to pay Defendant Fox and persuaded Defendants Street and Fox to withhold law enforcement protection from the Plaintiff and to deprive Plaintiff of her constitutional rights.

. . . . .

As a direct and proximate result of the defendants' conduct, Plaintiff has suffered actual damages in the form of physical injury, mental anguish, public embarrassment and humiliation, and loss of the enjoyment of life.

Complaint, at 11–13.

■ "A private RICO plaintiff only has standing to bring suit if [she] can show

---

**4.** The other allegations in the civil conspiracy claim appear to relate to allegations of a RICO conspiracy.

damage to 'business or property' proximately caused by the defendant's RICO violation." *Potomac Elec. Power Co. v. Electric Motor & Supply, Inc.,* 262 F.3d 260, 264 (4th Cir.2001), *cert. denied,* 535 U.S. 927, 122 S.Ct. 1297, 152 L.Ed.2d 209 (2002). "RICO confers standing on 'any person injured in his business or property,' not any person who can quantify the amount of the injury." *Id.,* at 265. Neither extreme mental anguish nor pecuniary loss stemming from personal injury confers standing sufficient to prosecute a private RICO claim. *Bast v. Cohen, Dunn & Sinclair, P.C.,* 59 F.3d 492 (4th Cir. 1995). As a result, Plaintiff's RICO claim is invalid. Since the substantive RICO claim is invalid, the RICO conspiracy claim is also invalid. *G.E. Investment Private Placement Partners II v. Parker,* 247 F.3d 543 (4th Cir.2001).

As for the § 1983 and § 1985(3) claims, Plaintiff alleges that Cynthia, Fox and Street conspired to deter her from attending court in the state alienation of affection action, *i.e.,* to deny her access to court, and to deprive her of equal protection by the use of excessive force. Complaint, at 9.

> To establish a civil conspiracy under § 1983, [Plaintiff] must present evidence that the [Defendants] acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [Plaintiff's] deprivation of a constitutional right[.] ... [Plaintiff] ha[s] a weighty burden to establish a civil rights conspiracy. While [she] need not produce direct evidence of a meeting of the minds, [she] must come forward with specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective. In other words, to survive a properly supported summary judgment motion, [Plaintiff's] evidence must, at least, reasonably lead to the inference that [the Defendants] positively or tacit-

ly came to a mutual understanding to try to accomplish a common and unlawful plan.

*Hinkle v. City of Clarksburg, W.Va.,* 81 F.3d 416, 421 (4th Cir.1996) (internal citations omitted).

Plaintiff alleges that Cynthia denied her access to court by intimidating her before and during the July 24, 2002, hearing in state court involving Byrd's alienation of affection action. During this hearing, North Carolina Superior Court Judge Robert Lewis was told by his bailiff that Byrd had kept her hand in her purse during most of the hearing. Deposition of Robert D. Lewis, at 13. The bailiff was concerned that she might have a weapon in her purse. *Id.* As a result, the Judge ordered the courtroom cleared and ordered the security officers to search any individual who wished to reenter the courtroom. *Id.,* at 19. It was this search of Byrd by Defendant Street upon which her excessive force claim is based.

When asked through interrogatories to name the persons having knowledge that Cynthia requested Deputy Street to appear at the hearing as a security officer, Plaintiff responded only that Cynthia's attorney had requested additional security during the court proceedings and that Deputy Street had been the security officer who had reported that Byrd appeared to have a weapon in her purse. Plaintiff's Answers to Interrogatories of Cynthia Hopson, *attached to* Cynthia Hopson's Motion for Summary Judgment, filed April 4, 2003, at 11–12. When asked to identify those persons who could testify concerning a prior agreement between Cynthia and Street to deny court access to Byrd, Plaintiff responded only that "[c]ircumstantial evidence discussed in detail in the foregoing answers to these interrogatories ... led Plaintiff to reasonably conclude that

the allegations in the Plaintiff's complaint ... were correct." *Id.* The alleged circumstantial evidence, however, is not extant. Moreover, the evidence relied on by the Plaintiff is inadmissible hearsay, conjecture or both. *See, e.g.,* Exhibit M, Plaintiff's Answers to Interrogatories Propounded by Jack Hopson and Barbara Hopson, *attached to* Plaintiff's Response to Defendants' Motion for Protective Order, filed May 8, 2003, ¶ 4 ("Cindy Hopson ... *was later heard* to ask ....."); ¶ 5 ("Ruby Bennett saw Cindy Hopson deliver to Kevin Hughes a bag which *appeared* to contain[ ] drugs."); ¶ 9 ("The foregoing raises inferences ..."); ¶ 11 ("This raises the inference ..."); ¶ 12 ("Barbara Hopson's *has been heard to say* ..."); ¶ 21 ("Cindy Hopson has sought protection from Donald Street for the purposes of 'added security' at the June 24, 2002 hearing ....") (emphasis added).

■ Nor did Plaintiff during her deposition provide any information establishing a conspiracy to deny her access to court.[5] Her claim that she was denied access to court stems solely from the fact that she was searched; nonetheless, she admits that after the search, the hearing continued. Byrd Deposition Vol. II, at 235–36. Nor did Plaintiff in the course of her deposition provide any information that Cynthia knew Street would be present in the courtroom that day and that she conspired with him (1) to accuse Byrd of having a gun; or (2) to use excessive force during a search of her following that accusation.

The existence of an alleged factual dispute between the parties will not defeat a properly supported motion for summary judgment, unless the disputed fact is one that might affect the outcome of the litigation. Mere speculation by the non-movant cannot create a genuine issue of material fact.... [I]nferences must "fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture." The function of the judge at the summary judgment stage is not to determine the truth of a matter or to weigh credibility· but to determine whether there is any genuine issue of fact that can only properly be resolved by a finder of fact because it could reasonably be resolved in favor of either party.... "One of the principle purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses."

*JKC Holding Co., LLC v. Washington Sports Ventures,* 264 F.3d 459, 465 (4th Cir.2001) (quoting *Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.,* 57 F.3d 1317, 1323 (4th Cir.1995) and *Celotex Corp., supra,* at 323–34, 106 S.Ct. 2548) (other citations omitted). Such is the case here. Plaintiff's claim of a conspiracy rests solely on conjecture—because Defendant Street was present at the hearing and because he conducted the search of Byrd, she concluded that Cynthia and Street had conspired to the events alleged.[6] As to Defendant Fox, there is no evidence at all that he was involved with this incident. "To survive a ·motion [for summary judgment against a] conspiracy claim under § 1983, a plaintiff must allege both a mutual understanding to achieve some unconstitutional action reached by the private and state defen-

---

5. The Court is compelled to note that this Plaintiff has had unparalleled access to state and federal courts and by her conduct clearly has not been deterred from pursuing her legal rights.

6. Plaintiff has also alleged that Street was the individual who reported the possible existence of a gun to Judge Lewis. However, at the deposition of Judge Lewis, he reported that his bailiff informed him of the potential problem. Lewis Deposition, at 9, 11.

dants and some factual assertions suggesting a meeting of the minds. When a complaint contains merely a vague allegation of conspiracy [and no evidence is presented in opposition to the motion for summary judgment]," the motion must be granted. *Howard v. Food Lion, Inc.*, 232 F.Supp.2d 585, 597 (M.D.N.C.2002) (internal citations omitted).

◼ In addition to the § 1983 conspiracy claim, Plaintiff alleged a § 1985 conspiracy.

> To state a claim for relief under 42 U.S.C. § 1985(3), the section of the Civil Rights Act of 1871 most applicable to Plaintiff's allegations, the complaint must allege that the defendant[s] (1) conspired; (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the law; (3) performed or caused to be performed any act in furtherance of the conspiracy; and (4) this conduct injured the plaintiff's person or property or deprived her of having and exercising any right or privilege of a United States citizen.

*Id.* (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102–03, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971)).

> Probably the most important holding of the Supreme Court's decision in *Griffin v. Breckenridge*, [*id.*], is that § 1985(3) can be used to reach conspiracies of private individuals. However, in order to ensure that § 1985(3) would not be construed as a "general federal tort law," the Court required that actionable private conspiracies must be motivated by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus."

*Manual on Employment Discrimination and Civil Rights Actions in the Federal Courts*, § 4:105; *accord, Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993); *United Bhd. of Carpenters & Joiners of America, Local 610, AFL–CIO v. Scott*, 463 U.S. 825, 829, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983). There having been no such animus alleged or shown here, this claim cannot survive summary judgment. *Id.*

Next, Plaintiff alleged a common law conspiracy based on (1) Defendants Cynthia, Jack and Barbara Hopson's conduct upon which the RICO claim was based, *i.e.*, using the store for illegal gambling, drugs and murder for hire; (2) the conspiracy between Cynthia and Nelson to kill Byrd, *i.e.*, another RICO claim; (3) the conspiracy among Cynthia, Fox and Street to deprive Byrd of her constitutional rights by the use of excessive force and by refusing to investigate vandalism; and (4) a similar conspiracy between Cynthia and Fox to harass Byrd by virtue of Cynthia's payment of bribes to Fox in exchange for his allowing her to sell drugs from the store, *i.e.*, another RICO claim. As previously noted, in North Carolina, there is no independent cause of action for civil conspiracy; the claim can arise only where there is an underlying claim for unlawful conduct. *Toomer, supra.* Since the underlying claims which would support a conspiracy theory have all been dismissed *infra*, no such cause of action lies.

Moreover, there has been no admissible evidence presented to support such conspiracies. Again, Plaintiff's deposition testimony disproves her contentions. As to the dealing of illegal drugs from the Hopson's store, Byrd testified that it was "well known knowledge." Byrd Deposition Vol. I, at 39. When asked if she had personally witnessed such conduct, she testified that she saw Cynthia hand to a customer "what appeared to be drugs. So let me phrase it that way." *Id.*, at 40. As for the money which changed hands, she acknowledged

that the customer "may have owed her money." *Id.*, at 41. As for the acts of vandalism, Byrd testified that "you wouldn't think a girl would do such a thing. [I]f she [Cynthia] didn't do it I'm sure that someone isn't sticking their neck out to do these things for nothing." *Id.*, at 58. "I'd be lying through my teeth if I said I saw her do it." *Id.*, at 146. The Hopson's, she testified, "must've known about" the illegal drugs. *Id.*, at 63. Despite all these claims, as well as the claim that her husband had been having an affair with Cynthia, Byrd continued to do business with Hopson's Store throughout the entire time period alleged in the complaint. *Id.*, at 94–99 ("[Y]ou continued to go to the store and trade despite the fact that in May of 2000 Cindy and Holger Nelson had called you both on the same line and threatened to kill you and discussed him being paid $10,000 to do it."). Byrd also admitted obtaining cocaine from an individual not a party to this action which she took to Sheriff Fox representing to him that it had been purchased from Cynthia. *Id.*, at 130–31. Byrd admitting making a telephone call to Cynthia during which she threatened to kill Cynthia. *Id.*, at 138–39. And, she admitted that she sometimes carries a .38 caliber pistol. *Id.*, at 179. Despite her claims that Sheriff Fox refused to investigate her allegations of vandalism, she testified that after each harassing call, someone from the Sheriff's Department did come to her home. Byrd Deposition Vol. II, at 192–97, 203. In fact, because of the volume of complaints received from Byrd, Sheriff Fox requested an independent review of his department's handling of her reports of being beaten, harassing telephone calls, and vandalism. Affidavit of Steve Nix, *attached to* Motion of Kenneth Fox and Donald Street for Summary Judgment, filed April 4, 2003. Agent Nix, who at the time was a special agent with the North Carolina State Bureau of Inves-

tigation, reported to his superiors the following information:

> During the Fall of 2000 ... Byrd reported to the MCSD [Mitchell County Sheriff's Department] she had been assaulted by an unknown male at her privately owned pond. MCSD responded and obtained a victim interview. Based on the description of the suspect by ... Byrd a subject had been located and presented to ... Byrd for identification. Byrd failed to identify the subject that greatly matched her description. . . .

> In late February 2001 an informant phoned the MCSD and delivered information regarding the location of a large amount of illegal drugs in the back of a truck owned by Cindi Hobson [sic]. Follow-up telephone calls from the informant added suspicion to the information and it was determined the drugs may have been placed in the truck by the informant. Byrd made herself the go between for the informant and the MCSD. The informant never appeared for debriefings or undercover controlled buys. . . . Assistant District Attorney Ted Mcentire refused prosecution on this case.

> . . . . .

> During the summer months of 2001 ... Byrd reported to the MCSD three separate larcenies from cabins on her property. On each of these occasion[ ]s a Deputy and a Detective responded only to find no signs of forced entry . . . .

> . . . . .

> During April and May 2001 ... Byrd taped telephone calls which she reported to be harassing and included threats made against ... Byrd at the hands of Cindi Hobson [sic]. Sheriff Fox stated the voice on the tapes matched the voice

of the informant from the drug issue described earlier.

. . . . .

Byrd reported to the MCSD she had found a bullet hole in the side of her house which she stated came from a drive by shooting several months earlier that had not been reported. Sheriff Fox contacted the NCSBI [North Carolina State Bureau of Investigation] to aid in the removal of the bullet from the house but the bullet hole appeared to be that of a nail in the gutter not a bullet. *Id.*, at Exhibit A. The Court finds the Plaintiff has failed to present admissible evidence which proves either the underlying conduct or conspiracy to engage in such conduct.

■ The final claim is for intentional infliction of emotional distress which is asserted only against Cynthia. "The elements of intentional infliction of emotional distress are: (1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress." *Phillips v. Restaurant Mgmt. of Carolina, L.P.,* 146 N.C.App. 203, 213, 552 S.E.2d 686, 693 (2001) (internal quotations and citations omitted). "[S]evere emotional distress means any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." *Id.*, at 214, 552 S.E.2d 686, 693–94 (internal quotations and citations omitted). Plaintiff, however, has presented no evidence of such distress. Her medical records do not disclose treatment for such distress and she has not consulted any mental health professional or therapist. "Summary judgment may be proper on an intentional infliction of emotional distress claim '[w]here the plaintiff fail[s] to forecast evi-

dence of medical documentation to substantiate alleged severe emotional distress or severe and disabling psychological problems[.]' " *Id.* (quoting *Dobson v. Harris,* 134 N.C.App. 573, 579, 521 S.E.2d 710, 715 (1999)) (other citations omitted).

■ Moreover, this claim, like all the claims brought against Cynthia, are barred by the doctrine of *res judicata.* On March 2001, Plaintiff filed a state court action alleging alienation of affection and criminal conversation. Exhibit A *attached to* Affidavit of Michele Duncan, *attached to* Cynthia Hopson's Motion for Summary Judgment, at 2. On November 8, 2001, that action was dismissed. *Id.*, at 47–63. On March 28, 2002, Plaintiff filed an adversary proceeding in the United States Bankruptcy Court in connection with Cynthia's bankruptcy. Requests for Admission, *attached to* Cynthia Hopson's Motion for Summary Judgment, at 4. Cynthia was granted a discharge by the Bankruptcy Court on April 2, 2002. *Id.* On August 14, 2002, Plaintiff's appeal from the dismissal of her alienation of affection action was dismissed. *See* Exhibit A, *attached to* Duncan Affidavit, *supra,* at 96–98. On September 10, 2002, the North Carolina Supreme Court denied a petition for review. *Id.*, at 99. This action was filed on September 16, 2002.

The language used by the state court judge in his decision dismissing the action for alienation of affection is telling. Judge Helms noted that Plaintiff had not only accused Cynthia of having an affair with her husband but had retained a private investigator who installed surveillance devices in Cynthia's home without her knowledge. *Id.*, at 49. Plaintiff then advised Cynthia that the investigator had taken video tapes and photographs of Cynthia and Plaintiff's husband having sexual intercourse. *Id.* Plaintiff threatened to send

copies of these items to Cynthia's church and to her mother. *Id.*

When [Cynthia] told [Plaintiff's messenger, Campbell,] that there could not possibly be such photographs or video tapes in existence .as the acts which Ms. Campbell had described had not occurred[,] Ms. Campbell replied with language referencing that the private detective retained by the Plaintiff was very skilled in his profession.

*Id.* ·

[Betty Byrd] entered into a conspiracy with a person named Anthony Raburn to have [Cynthia] charged with possession of cocaine in order to have [Cynthia] arrested. In the conspiracy [Byrd] and Anthony Raburn agreed that Anthony Raburn would contact Sheriff Ken Fox and would advise Sheriff Fox and his deputies that [Cynthia] had cocaine in the open bed of a truck which was usually operated and used by [Cynthia].

*Id.,* at 50. ·

In Request for Production of Documents 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 20, 26, and 28[,] [Cynthia] sought the production of photographs, video tapes, and audio tapes from either [Byrd], [Byrd's] counsel, or the private detective retained by [Byrd]. [Byrd] told [Cynthia's] mother of the existence of ·such photographs.... [Byrd's] response in the Request for Production of Documents was that neither [Byrd], her counsel, nor the detective had any photographs or audio tapes such as had been described.... [W]hen the Court inquired of [Byrd] as to why [Byrd] had told [Cynthia] lies and untrue statements about the existence of the photographs, video tapes, and audio tapes[,] the response was that [Byrd] wanted to "worry [Cynthia]."

*Id.,* at 56–57.

The Court ordered Byrd's complaint dismissed and entered judgment for Cynthia on her counterclaim. *Id.,* at 63. In that decision, the Judge also ruled as follows:

It is further ordered that [Byrd] is hereby found to be in·contempt of the Order of Judge James L. Baker, Jr., Resident Superior Court Judge for the 24th Judicial District, wherein Judge Baker ordered the Plaintiff to answer the Interrogatories and respond to the Request for Production of Documents as referenced above and that [Byrd] is allowed to purge herself of said contempt by complying with the following Order of this Court ordering [Byrd] not to communicate with [Cynthia] for any purpose or in any way or in any manner whatsoever, including letter, telephone, messenger or any other means of communication other than by [Byrd's] counsel being allowed to communicate with [Cynthia's] counsel concerning matters raised upon the pleadings herein.

*Id.*

■ During the pendency of the state court action, Byrd did not amend her complaint to add allegations made in this action. By the time that action was dismissed, Byrd had been aware of each of those allegations with the exception of the alleged burglaries occurring in 2002 and the July 2002 incident involving Deputy Street.

Res judicata precludes the assertion of a claim after a judgment on the merits in a prior suit by parties or their privies based on the same cause of action. The preclusive affect of a prior judgment extends beyond claims or defenses actually presented in previous litigation, for "[n]ot only does res judicata bar claims that were raised and fully litigated, it prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless

of whether they were asserted or determined in the prior proceeding."

*Meekins v. United Transp. Union,* 946 F.2d 1054, 1057 (4th Cir.1991) (quoting *Peugeot Motors of America, Inc. v. Eastern Auto Distrib., Inc.,* 892 F.2d 355, 359 (4th Cir.1989)) (other citations omitted). Stated simply, "if the later litigation arises from the same cause of action as the first, then the judgment bars litigation not only of every matter actually adjudicated in the earlier case, but also of every claim that might have been presented." *In re Varat Enter., Inc.,* 81 F.3d 1310, 1315 (4th Cir. 1996). Res judicata may be established by showing " '(1) a final judgment on the merits in a prior suit, (2) an identity of the cause of action in both the earlier and the later suit, and (3) an identity of parties or their privies in the two suits.' " *Jones v. S.E.C.,* 115 F.3d 1173, 1178 (4th Cir.1997) (quoting *Meekins, supra*). The state court order was a final judgment despite the fact that an appeal may have been pending. The fact that the case is on appeal does not detract from the finality and decisiveness of that ruling. *Huron Holding Corp. v. Lincoln Mine Operating Co.,* 312 U.S. 183, 61 S.Ct. 513, 85 L.Ed. 725 (1941). As to every claim except the July 2002 factual allegations, this action " 'arises out of the same transactions or series of transactions as the claim resolved by the prior judgment.' " *Meekins,* 946 F.2d at 1058 (quoting *Harnett v. Billman,* 800 F.2d 1308, 1313 (4th Cir.1986)). With the exception of Defendant Street and the July 2002

incident, Byrd was aware of both the parties and the claims. *Id.,* at 1057. The Court, therefore, finds as an additional ground, that summary judgment must be granted for Cynthia based on *res judicata.*

**B. Defendant Nelson' Motion for Summary Judgment**

For the same reasons as stated in connection with his motion to dismiss, the Court finds the motion for summary judgment should be granted. It is clear from the Plaintiff's deposition testimony that she knew at the latest by June 2001 that Nelson had been accused of the assault and battery. Thus, her complaint filed in September 2002 was time-barred.[7]

**C. Motion for Summary Judgment of Defendants Jack and Barbara Hopson**

For the same reasons as stated *infra* in connection with Cynthia's motion, summary judgment as to the RICO and common law conspiracy claims is granted. Plaintiff did not allege the Hopson's were involved in the federal conspiracies, therefore, that portion of the motion is not addressed. Moreover, principles of *res judicata* bar this action against the Hopson's.

**D. Motion for Summary Judgment of Defendants Fox and Street**

For the same reasons as stated *infra* in connection with Cynthia's motion, sum-

---

7. In response to the motion, Plaintiff attached an affidavit from Willard Bennett in which he states that he listened to a tape recording of a telephone call received at an unspecified date by Byrd at her home. Affidavit of Willard Bennett *attached to* Plaintiff's Response to Defendant Holger Nelson's Motion for Summary Judgment, filed April 23, 2003. Bennett stated that he "believed" the speaker on the tape to be Nelson. *Id.* The affidavit also contains the signature of Ruby Bennett. *Id.* In

any event, there is no date specified as to the date of the telephone call. In response to the motion for summary judgment of Defendants Fox and Street, Plaintiff attached two additional affidavits, neither of which contains any information relevant to this action. *See* Affidavit of Jared Bennett and Affidavit of Ruby Bennett, *attached to* Plaintiff's Brief in Response to the Brief of Defendants Fox and Street in Support [of] their Motion for Summary Judgment, filed April 23, 2003.

mary judgment is granted for Defendants Fox and Street in connection with the claims of federal conspiracies, RICO violations and common law conspiracy. Byrd has also alleged a claim against Fox and Street pursuant to § 1983 for an illegal search, denial of access to court and the use of excessive force.

During the July 24, 2002, hearing, Judge Lewis received a note from his bailiff saying that the bailiff needed to see the Judge as soon as possible. Lewis Deposition, at 9. The bailiff told the Judge that Byrd had kept her hand in her purse throughout the hearing and the bailiff was concerned that she might have a weapon. *Id.*, at 13. Based on the Judge's experience, courtroom security could be endangered, especially during volatile proceedings such as alienation of affection cases. *Id.*, at 14–16, 24. As a result, Judge Lewis ordered the courtroom cleared and ruled that no one could return to the courtroom unless they submitted to a search of their person. *Id.*, at 15–17, 24. Judge Lewis testified that while everyone else in the courtroom immediately left, Byrd did not do so and when approached by the bailiff, she became agitated. *Id.*, at 18, 20. Byrd complained that she had kept her hand in her purse out of fear that she would have a nose bleed. *Id.* Byrd turned to Judge Lewis to explain why she had kept her hand in her purse, however, the Judge told her to leave the courtroom. *Id.*, at 19. She was not searched while she was in the courtroom. *Id.* After she returned to the courtroom, neither Byrd nor her attorney complained to the Judge about the search or any problems relating thereto. *Id.*, at 19–26, 28. She remained in the courtroom until the end of the hearing. *Id.*, 29–30. Sheriff Fox never blocked Byrd's entrance and it was the Judge who ordered the courtroom emptied. *Id.*, at 42–43.

■ The Supreme Court has observed that searches without *any* suspicion "may rank as 'reasonable'—for example, searches now routine ... at entrances to courts and other official buildings." *Chandler v. Miller*, 520 U.S. 305, 323, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997). Judges, without question, have the authority and duty to control their courtrooms. *Sheppard v. Maxwell*, 384 U.S. 333, 358, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). "Therefore, the Fourth Amendment protection against unreasonable searches and seizures is inapplicable to a courtroom in the exercise of the trial judge's authority and duty to preserve security and order." *State v. Shelton*, 270 S.C. 577, 243 S.E.2d 455 (1978).

The Fourth Amendment, as a general matter, requires probable cause and a search warrant before an official may conduct a search. Judge-made exceptions to the general rule, however, are legion. One such exception—the one applicable here—is found in *Terry v. Ohio*, 392 U.S. 1[, 88 S.Ct. 1868, 20 L.Ed.2d 889][ ] (1968). A *Terry* stop has been defined as "the act of a police officer's stopping a person whose behavior is reasonably considered suspicious and frisking that person for weapons." ... [R]easonable suspicion requires only specific objective facts upon which a prudent official, in light of his experience, would conclude that illicit activity might be in progress.

●　　　●　　　●　　　●　　　●

■ [Deputy Street] was acting pursuant to ... instructions from Judge [Lewis] and on the basis of information from a member of Judge [Lewis'] staff that [Byrd] might have a weapon. Under the circumstances, a reasonable official in [Street's] position would have entertained sufficient suspicion to justify a search. The fact that the officer's infor-

mation turned out to be erroneous is not a reason for holding [Street] liable; the question, to repeat, is the *reasonableness* of his action.... [H]is actions were reasonable and [Street is] entitled to qualified immunity.... In today's world, sad to say—and given the emotionally charged character of a [alienation of affection] proceeding ...—it does not seem ... that Judge [Lewis'] concerns were objectively unreasonable.

*McPherson v. Kelsey,* 125 F.3d 989, 993–94 (6th Cir.1997). Because the deputy was acting on instructions from the Judge, no claim can lie against Fox for failure to enact policies sufficient to protect against unreasonable searches.

 Moreover, because Street was acting on the Judge's instructions, no claim for denial of access to court can survive. Byrd admitted that she returned to the courtroom and attended the remainder of the hearing. *Sheppard v. Beerman,* 18 F.3d 147, 152 (2d Cir.1994) ("Sheppard admits that he was allowed to examine files outside of Beerman's courtroom and that he was also permitted to listen to cases as long as he did not disrupt Beerman's courtroom proceedings or waste the court's time."). She has thus failed to establish a deprivation of access to the courts because (1) she returned to the courtroom and thus, there is no underlying cause of action; and (2) the official act of the search did not frustrate her litigation. *Christopher v. Harbury,* 536 U.S. 403, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002). "Clearly, [Judge Lewis] was entitled to exercise his discretion in keeping decorum in his courtroom." *Sheppard, supra.* The Court, therefore, finds that Plaintiff cannot withstand summary judgment on the claims of illegal search and denial of access to the courts.

The final claim is that Deputy Street used excessive force during the search.

Plaintiff's deposition testimony contained the following description of the search:

> And I don't know who did it—...—but he said, I am gonna search you.
>
> . . . . .
>
> I think it was Nath-, Didn't Nathan have ... had ahold—you'll have to ask them who had a hold of the door. But what happened was I was carrying a purse and it was real, that real heavy nylon, real stout. And it had one snap in the middle.
>
> . . . . .
>
> [H]e run his hand in my purse. And when he did he latched onto it. It's cloth and latched onto it like this ... from the inside of my purse.... And when he jerked it, I did not see it but some of the others did—... him come up with his knee. I didn't see that. I felt it but I did not see it. And when he jerked it I went directly into the edge of that door. Well, my knee took that full impact. And it hurt like—you know how you would bump your elbow ....

Byrd Deposition Vol II, at 227, 228–29, 230.

Emergency room records show Plaintiff was seen at approximately 9:00 PM on July 24, 2002, for pain in her right knee and hip. She was given ice for pain and discharged. *See* Exhibit G, *supra.*

Treatment notes from her regular physician contain a notation from a visit on August 9, 1993, for "multiple complaints" including "a one week history of severe pain and tenderness in the left medial knee." Medical Records for Treatment of Plaintiff by Dr. David N. Freemon, *attached to* Cynthia Hopson's Motion for Summary Judgment. By September 1993, she had been diagnosed with diabetes mellitus and was being treated for an anxiety disorder with Xanax. *Id.* In November

1995, the Plaintiff "[i]ncidentally, ... also complain[ed] of some pain with her left knee. States that Dr. Freemon had given her some medicine some time ago which improved her symptoms. [W]e discovered it to be Relafen. She was given an orthopedic referral for which she did not follow up at that time. Continues to have some crepitus in the knee." *Id.* In 1996, she was diagnosed with chronic pain originating in 1994 when she was in a motor vehicle accident. *Id.* She described "a lot of generalized joint and muscle discomfort since that time." *Id.* She took Elavil for the pain. *Id.* In February 1998, the Plaintiff was in another car accident and was prescribed Percocet for her pain. *Id.* In August 1998, she reported experiencing low back and leg pain. *Id.* In August 1999, Plaintiff was treated after a fall which caused her to have trouble walking. *Id.* Plaintiff continued to be treated for diabetes and chronic anxiety disorder through 1999 and 2000. *Id.* Her physician opined that "the basic problem here is that she just doesn't take very good care of herself." *Id.*

During treatment following the May 2000 incident, it was discovered that the Plaintiff had a brain tumor. *Id.* Her primary physician referred her to a neurosurgeon for further evaluation. *Id.* There are no medical records from the neurosurgeon. In March 2001, the Plaintiff reported to her physician that "she has been having some marital problems. We talked about that at some length." *Id.* He continued to prescribe Xanax for anxiety disorder "with increased marital maladjustment and stress." *Id.* In October 2001, she reported continued stress "primarily relating to marital problems and she is apparently being sued." *Id.* In March 2002, she reported "that she has been under a lot of stress lately with some litigation and with some marital problems." *Id.* The physi-

cian continued to treat her diabetes and anxiety disorder. *Id.*

On September 20, 2002, the Plaintiff was seen again by her treating physician who reported that, "She said she injured her right knee July the 24th and I was supposed to get a letter from the orthopedic surgeon that she saw. She says it's been very painful and she hit the patella on the edge of a door. She's been trying to stay off of it. Ms. Byrd admits that she doesn't take very good care of herself." *Id.* There is no letter in evidence from the surgeon.

The physical therapist who first treated the Plaintiff on August 13, 2002, was deposed during the course of this litigation and her transcript was placed in the record. Anna R. Stanko testified that the Plaintiff told her "that she had suffered an injury to her knee back in July. She didn't go into a lot of detail as to how that injury happened. I think she said it got hit by a door maybe but did not go into any specific details other than that." Deposition of Anna R. Stanko, at 7–8. Ms. Stanko's medical notes indicated that the Plaintiff reported that she had been "jerked into a door." *Id.,* at 13. However, she did not report that this had occurred during an assault by a law enforcement officer. *Id.* There was no bruising on the Plaintiff's leg when she was first seen by Ms. Stanko in August 2002. *Id.,* at 29. In the opinion of Ms. Stanko, the type of injury described by the Plaintiff would not cause the circulatory problems found in the Plaintiff's right leg during Ms. Stanko's evaluation. *Id.,* at 12. The circulatory problems improved during therapy. *Id.* Ms. Stanko opined that the problems in the Plaintiff's right foot were caused by a circulatory problem. *Id.,* at 30. Ms. Stanko also testified that

[i]n my professional opinion, [Plaintiff] does not present as if she needs to have the leg amputated at this time.... I do

not know of anybody that has had an amputation due to an injury like this. Most patients that I have seen that have had amputations are usually due to problems with wounds that do not heal, any other sort of traumatic injuries to the lower foot or lower leg that do not heal.... Circulation problems can be caused by diabetes.

*Id.,* at 15. She further testified that the injury to the Plaintiff's leg was not permanent and she should have been able to return to her normal functional abilities. *Id.,* at 18. The Plaintiff reported to Ms. Stanko that she was afraid of losing her leg due to her diabetes which she described as "uncontrollable." *Id.,* at 31.

By November 2002, the benign brain tumor appeared to be causing a tremor in her right hand. Medical Records for Treatment of Plaintiff by Dr. Freemon, *supra.* She reported that she continued to have "a lot of family and personal problems." *Id.* The physician continued to treat her anxiety disorder with Xanax. *Id.* By December 2002, the tremor had extended to her right arm and she was having difficulty with balance. *Id.* Although she was to have had a MRI in July 2002, she admitted to her doctor that she had neglected to have it done. *Id.* "I told her that this needs to be taken care of and I ordered MRI of the brain ...." *Id.*

In excessive force cases, entitlement to qualified immunity must be analyzed in two steps, which are to be "considered in proper sequence." The "threshold question" requires a court to resolve the issue ... whether "[t]aken in the light most favorable to the party asserting the injury, ... the facts alleged show

[that] the officer's conduct violated a constitutional right." "If no constitutional right would have been violated," even when the facts are viewed in the best light for the injured plaintiff, the analysis ends; the plaintiff cannot prevail.

*Jones v. Buchanan,* 325 F.3d 520, 526 (4th Cir.2003) (quoting *Saucier v. Katz,* 533 U.S. 194, 200–01, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). "The Fourth Amendment prohibition on unreasonable [searches and] seizures bars police officers from using excessive force to [search or] seize a free citizen." *Id.,* at 527. "Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers' violates the Fourth Amendment." [8] *Id.* (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973)) (footnote added).

A court determines whether an officer has used excessive force to effect a seizure based on a standard of "objective reasonableness." [It should] consider facts "from the perspective of a reasonable officer on the scene," and avoid judging the officer's conduct with the "20/20 vision of hindsight," recognizing that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." [The court does]

---

8. Although the Plaintiff's complaint alleges that Street's conduct violated her Fourth and Fourteenth Amendment rights, she acknowledges in her brief that only the Fourth Amendment is at issue. Plaintiff's Brief in Response to the Brief of Defendants Fox and

Street, *supra,* at 9. In any event, the standard applied under the Fourteenth Amendment is a more stringent one for a plaintiff, *i.e.,* whether the force was maliciously and sadistically used for the purpose of causing harm. *Taylor v. McDuffie,* 155 F.3d 479, 483 (4th Cir.1998).

not consider the officer's "intent or motivation." Rather, "the question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." [The court should] weigh "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." This test requires [it] to determine the reasonableness of an officer's actions and is "not capable of precise definition or mechanical application." Instead, it "requires careful attention to the facts and circumstances of each particular case." Those facts and circumstances include "the severity of the crime at issue," whether the "suspect poses an immediate threat to the safety of the officers or others," and whether the suspect "is actively resisting arrest or attempting to evade arrest by flight." The extent of the plaintiff's injury is also a relevant consideration. The "question [is] whether the totality of the circumstances justified a particular sort of ... seizure."

*Jones,* 325 F.3d at 527–28 (quoting *Graham, supra,* at 396–97, 399, 109 S.Ct. 1865, and *Tennessee v. Garner,* 471 U.S. 1, 8–9, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)) (other internal citations omitted).

■ As to the "nature and quality of the intrusion," Plaintiff concedes that in order to return to the hearing, she was obligated to consent to the search of her person and purse. Plaintiff's Brief in Response to Brief of Defendants Fox and Street, *supra.* As to the reasonableness of the manner in which Street conducted the search, the Plaintiff herself described the encounter in innocuous terms: "he r[a]n his hand in my purse. And when he did he latched onto it. It's cloth and latched onto it like this ... from the inside of my purse.... And when he jerked it, I did not

see it but some of the others did—... him come up with his knee. I didn't see that. I felt it but I did not see it. And when he jerked it I went directly into the edge of that door." Byrd Deposition Vol. II, at 230. The officer's hand caught on the inside of the purse and he pulled it to bring it around for searching. At the same time, his knee made contact with the Plaintiff in some manner causing her knee to run into the edge of a door. This incident clearly describes *de minimis* force. *See, e.g., Crumley v. City of St. Paul, Minn.,* 324 F.3d 1003, 1007–08 (8th Cir.2003) (Pushing and shoving arrestee is *de minimis* force); *Vinyard v. Wilson,* 311 F.3d 1340, 1348 n. 13 (11th Cir.2002) (Officer's grabbing of small woman's arm and jerking her out of her chair was *de minimis* ); *Nolin v. Isbell,* 207 F.3d 1253 (11th Cir.2000) (Officer who grabbed plaintiff from behind, threw him into a van, kneed him in the back and pushed his head into the side of the van used only *de minimis* force); *Harris v. City of Virginia Beach, Va.,* 11 Fed.Appx. 212 (4th Cir.2001) (Using handcuffs applied too tightly and abusive language was *de minimis* force); *Karadi v. Jenkins,* 7 Fed.Appx. 185 (4th Cir. 2001) (Officer who "grabbed" plaintiff's arm did not use excessive force.); *Williams v. Bramer,* 180 F.3d 699, *clarified on reh'g,* 186 F.3d 633 (5th Cir.1999) (Officer who choked plaintiff during a search of his mouth used *de minimis* force); *Edwards v. Giles,* 51 F.3d 155, 157 (8th Cir.1995) (Officer who "threw" plaintiff to the ground did not use excessive force, despite cut sustained to the plaintiff's stomach); *Ferrell v. Clackamas County Sheriff's Dep't,* 12 F.3d 1106 (table), 1993 WL 501590 (9th Cir.1993) (Officer who pushed plaintiff into desk used *de minimis* force).

Nor has the Plaintiff established that she suffered anything other than a *de minimis* injury. *Crumley,* 324 F.3d at 1008.

Plaintiff has not "present[ed] any medical records indicating she suffered any long-term or permanent physical injury as a result of" her encounter with Street. *Id.* Indeed, the testimony of her physical therapist was that Byrd did not suffer a permanent injury and should be able to regain full function of her leg. Thus, Plaintiff's "abstract assertions tell [the court] nothing more than that [the] officer used some physical power to move" Byrd in order to conduct the search, "an action [she] concedes is lawful." *Edwards*, 51 F.3d at 157. "[A]llegations of pain ... without some evidence of more permanent injury" are insufficient to support a claim of excessive force. *Crumley, supra.* "Indeed, [Byrd] has not even adduced any evidence of the force used against [her] (or of the character of the encounter in general) other than [her] own subjective assertions that [she] was ["jerked"] and that [she] was "pushed [into the edge of a door]" and that [she] experienced [pain]. Manifestly, this is not sufficient." *Martin v. Mendoza*, 230 F.Supp.2d 665, 671 (D.Md.2002). The Court, therefore, concludes as a matter of law that the Plaintiff has failed to establish the violation of a constitutional right. As a result, "the analysis ends; the plaintiff cannot prevail." *Jones*, 325 F.3d at 526.

## IV. MISCELLANEOUS MOTIONS

On April 4, 2003, Defendants Fox and Street moved to strike the complaint, or in the alternative, for an order to compel responses to discovery. In view of the above rulings, the Court finds the motion is moot. Likewise, Defendant Cynthia Hopson's motion for sanctions filed April 4, 2003, for failing to comply with discovery is moot as it relates to this action.

On May 8, 2003, Plaintiff responded to an earlier motion of the Defendants for a protective order. That motion was decided by the Court's Order of March 7, 2003. The response is, therefore, moot.

On April 4, 2003, Defendant Cynthia Hopson moved for an order to compel discovery. In view of the rulings made herein, that motion as well is moot.

On April 17, 2003, Plaintiff moved to continue the trial from the July 2003 term and for additional time to respond to the various motions. However, Plaintiff also filed responses to all of the motions with the exception of the motions for sanctions. Both requests are, therefore, moot.

The parties' motions for sanctions pursuant to Rule 11 are considered by separate order.

## V. ORDER

**IT IS, THEREFORE, ORDERED** that the Defendant Holger Nelson's motions to dismiss and for summary judgment are **ALLOWED.**

**IT IS FURTHER ORDERED** that the Defendant Cynthia Hopson's motions to dismiss and for summary judgment are **ALLOWED.**

**IT IS FURTHER ORDERED** that the motion of Defendants Jack and Barbara Hopson for summary judgment is **ALLOWED.**

**IT IS FURTHER ORDERED** that the motion of Defendants Kenneth Fox and Donald Street for summary judgment is **ALLOWED.**

**IT IS FURTHER ORDERED** that, based on the rulings above, the motions of Defendants Fox and Street to strike Plaintiff's complaint; the motion of Defendant Cynthia Hopson for sanctions and to compel discovery pursuant to Rule 37; and Plaintiff's motion for continuance and to deviate from the scheduling order are hereby **DENIED** as moot.

A Judgment encompassing the rulings herein is filed contemporaneously herewith.