303 Ga. 428
FINAL COPY

S17A1804. WXIA-TV et al. v. STATE OF GEORGIA et al.

BLACKWELL, Justice.

This is an appeal from a gag order, which restrains the lawyers in a murder case, the defendant and the lawyers in a related case, court personnel, and current and retired law enforcement personnel from making extrajudicial, public statements on certain subjects related to the murder case for so long as it remains pending. A gag order like this one may be constitutionally permissible in exceptional circumstances, but the record here does not reveal circumstances sufficiently exceptional to warrant such a restraint. For that reason, we vacate the gag order.

1. Soon after Tara Grinstead went missing from Irwin County in October 2005, her disappearance attracted significant media attention. The Georgia Bureau of Investigation (GBI) and other law enforcement agencies investigated her disappearance for more than 11 years, and throughout the course of that lengthy investigation, news organizations continued to show an interest,

reporting from time to time on her disappearance and developments in the investigation. When Ryan Alexander Duke was arrested on February 23, 2017 and charged with Grinstead's murder, his arrest unsurprisingly was the subject of extensive media coverage. From the record, it appears that the media coverage was most intense in Irwin County and surrounding areas of central and south Georgia. To a lesser extent, the record shows that Duke's arrest also was covered by television stations and newspapers in Atlanta, as well as some national news organizations.

Five days later, the Superior Court of Irwin County issued a gag order,[1] which forbade several classes of persons (some of which were indeterminate) from making extrajudicial, public statements about the case:

> [D]uring the pendency of this case and until final determination in the trial court, the prosecution, all law enforcement, [Duke], counsel for [Duke], potential witnesses, expert and other, court personnel and family members for both [Duke] and [Grinstead] shall not make, release or authorize the release of any extra judicial

---

[1] The superior court issued the gag order at Duke's request. The superior court also placed Duke's motion for a gag order under seal, and it was transmitted under seal to this Court as a part of the record on appeal. We have reviewed the sealed motion, and there is nothing in it that is confidential or likely to prejudice Duke in any way. Accordingly, we direct that portion of the record to be unsealed. See Undisclosed LLC v. State, 302 Ga. 418, 421 (2) (b) (807 SE2d 393) (2017) (discussing right of public access to judicial records).

statements for dissemination by any means of public communication relating to any matters having to do with this case.

The superior court issued this gag order without an evidentiary hearing, but it found that "this case is high profile and has generated extensive media coverage." The court concluded that "there is a reasonable likelihood that [Duke]'s Sixth Amendment right to a fair trial by an impartial jury may be prejudiced by extra judicial statements," and for that reason, "an [o]rder restricting statements made outside of the courtroom is necessary and proper."

Nine news organizations (including WXIA-TV and 13 WMAZ-TV)[2] and Grinstead's sister promptly filed motions to intervene and to set aside the gag order. The superior court allowed intervention, and it set a hearing on the motions to set aside. At that hearing, counsel for the news organizations argued that the gag order impaired their news gathering, that it was a constitutionally impermissible prior restraint, that it swept too broadly, and that it was improperly issued without any evidentiary record to support it. In response to

---

[2] In addition to WXIA-TV and 13 WMAZ-TV, motions to intervene and set aside the gag order were filed by WSB-TV, the Atlanta Journal-Constitution, the Associated Press, the Macon Telegraph, the Valdosta Daily News, the Tifton Gazette, and the Moultrie Observer. These other news organizations, however, have not joined WXIA-TV and 13 WMAZ-TV in bringing this appeal.

3

the last point, Duke tendered 78 exhibits, which consist of online search results and published articles and commentary that illustrate the extent of media coverage and public interest in Grinstead's disappearance and the murder case against Duke. In light of the significant media attention, Duke's lawyer argued that a gag order was warranted and necessary, and the prosecuting attorney said that the State did not object to a gag order.

Following the hearing, on March 27, 2017, the superior court issued the modified gag order that is the subject of this appeal. The modified gag order provides in pertinent part:

> During the pendency of the [case against Duke and an apparently related case], and until [their] final determination in this Court (including sentencing, if applicable), or until further order of this Court to the contrary, the District Attorney (and all persons associated with his office), counsel for [Duke] (and all persons associated with his office), [the defendant in the related case], counsel for [the defendant in the related case] (and all persons associated with his office), the Court staff, current and past members or employees of law enforcement who participated in the investigation or who have knowledge of facts uncovered by the investigation, shall not release, make or authorize the release of any extrajudicial statement by any means of public communication and news media relating to:
> > a. the character, credibility, reputation or criminal record of [Duke] or the identity of a witness or the expected testimony of a party or witness;

4

b. the possibility of a plea of guilty to the offense charged;

c. the existence or contents of any confession, admission or statement given by [Duke] or his refusal or failure to make a statement;

d. the performance or results of any examination or test or the refusal or failure of [Duke] to submit to examinations or tests or the identity or nature of physical evidence expected to be presented;

e. any opinion as to the guilt or innocence of [Duke]; and

f. information that the lawyers know or reasonably should know is likely to be inadmissible as evidence at trial and that would, if disclosed, create a substantial risk of prejudicing an impartial trial.

The modified gag order is considerably narrower than the original gag order. It applies to fewer and better-defined classes of persons than the original gag order.[3] And it does not forbid all extrajudicial, public statements about the case, only statements upon the enumerated topics.[4] In addition, the modified gag order

---

[3] More specifically, the modified gag order does not apply to all law enforcement personnel, but only to those "who participated in the investigation or who have knowledge of facts uncovered by the investigation." In addition, the modified gag order does not extend to witnesses other than law enforcement personnel, nor does it extend to Duke's family or Grinstead's family.

[4] The modified gag order clarifies that the persons covered by the order are permitted to make extrajudicial, public statements about "[Duke's] identity, age, residence, occupation, and family status," "a request for assistance in obtaining evidence," "information contained in a public record or that is subject to an Open Records Demand pursuant to Georgia law," "the claim, offense or defense involved," "the fact, time, and place of arrest," "the identity of investigating and arresting officers or agencies and the length of the investigation," "the

explicitly states that it is not a restraint upon speech by "members of the media or other members of the public," and the modified gag order itself does not limit access to judicial proceedings or judicial records in the case. As a basis for the modified gag order, the superior court made several findings of fact about the significant attention that the case has received from the media.

WXIA-TV and 13 WMAZ-TV filed a motion to reconsider the modified gag order. They acknowledged that it is narrower than the original gag order, but they argued that it still is constitutionally impermissible. In particular, they urged that the evidentiary record and findings of fact do not establish a sufficiently high likelihood of prejudice to warrant any restraint and that the superior court in any event failed to give adequate consideration to less restrictive alternatives. The superior court took no action on the motion to reconsider, and WXIA-TV and 13 WMAZ-TV then brought this appeal.[5]

_____

scheduling or result of any step in the judicial proceedings," and "information as permitted by Georgia Rule of Professional Conduct 3.8 (g)."

[5] Although no party to this appeal disputes our jurisdiction, we have an independent obligation to inquire into our jurisdiction. See State of Ga. v. Intl. Keystone Knights of the Ku Klux Klan, 299 Ga. 392, 396-397 (2) (788 SE2d 455) (2016). First, we are satisfied that the modified gag order is an appealable judgment, either because it is appealable as a final judgment under the collateral order doctrine, see Rivera v. Washington, 298 Ga. 770, 774 (784 SE2d 775) (2016), or because it functionally amounts to an injunction, see OCGA § 5-6-34 (a) (4). See also United States v. Ford, 830 F2d 596, 598 (6th Cir. 1987) (noting that

6

2. To begin, we consider whether WXIA-TV and 13 WMAZ-TV have standing to challenge the modified gag order, notwithstanding that it does not restrain them directly. The United States Supreme Court has recognized that the freedom of speech implies a "right to receive information and ideas," Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, 425 U. S. 748, 757 (III) (96 SCt 1817, 48 LE2d 346) (1976) (citation and punctuation omitted), and the Supreme Court has acknowledged that the First Amendment offers some protection to news gathering by journalists. See Branzburg v. Hayes, 408 U. S. 665, 681 (II) (92 SCt 2646, 33 LE2d 626) (1972) ("[W]ithout some protection for seeking out the news, freedom of the press could be eviscerated."). Consonant with this recognition, the federal courts have held in a number of cases that a news organization may have standing to challenge a restraint upon the speech of another when that restraint impairs its own ability to effectively engage in news gathering. See Davis v. E. Baton Rouge Parish School Bd., 78

several federal courts of appeals have held that litigation gag orders are appealable under federal collateral order doctrine). Second, we are satisfied that this Court has jurisdiction of the subject matter of this appeal. We have jurisdiction of appeals in murder cases, see Neal v. State, 290 Ga. 563, 569-570 (722 SE2d 765) (2012) (Hunstein, C. J., concurring), including appeals from collateral orders in murder cases. See State v. Murray, 286 Ga. 258, 259 (1) (687 SE2d 790) (2009). We also have jurisdiction of appeals from injunctions "concerning proceedings in [murder cases]." OCGA § 15-3-3.1 (a) (2).

F3d 920, 926 (II) (B) (5th Cir. 1996) ("Several courts have held that news agencies have standing to challenge confidentiality orders in an effort to obtain information or access to judicial proceedings, although they are neither parties to the litigation nor restrained directly by the orders.") (citing cases). See also United States v. Aldawsari, 683 F3d 660, 664-665 (III) (A) (5th Cir. 2012) (standing to challenge gag order in criminal case); In re Application of Dow Jones & Co., 842 F2d 603, 607-608 (2d Cir. 1988) (standing to challenge gag order restraining speech of trial participants); CBS Inc. v. Young, 522 F2d 234, 237-238 (6th Cir. 1975) (standing to appeal gag order prohibiting parties to litigation from publicly discussing case).[6]

Some federal courts have limited such standing to cases in which there is "reason to believe that [an] individual subject to the gag order is willing to speak and is being restrained from doing so," United States v. Wecht, 484 F3d 194, 202 (II) (A) (1) (3d Cir. 2007) (citation and punctuation omitted), whereas others have "found media standing to challenge confidentiality orders without expressly finding the existence of a willing speaker." Davis, 78 F3d at 927 (II)

[6] We note that we previously have looked to federal cases for guidance in assessing standing under Georgia law. See Oasis Goodtime Emporium I v. City of Doraville, 297 Ga. 513, 518 (2), n. 9 (773 SE2d 728) (2015).

8

(B). Whether or not standing depends on a reason to believe that someone restrained by a gag order would otherwise be willing to speak, the record in this case suggests the existence of willing speakers. The record shows that the case has produced significant media coverage, and at least on some occasions, that coverage has been based in part on information provided by law enforcement sources. In the modified gag order, the superior court found that GBI officials held a press conference just days before the issuance of the original gag order, and subsequent to that press conference, GBI officials spoke with reporters. Several of the news articles submitted by Duke at the hearing below purport to quote or otherwise attribute information to law enforcement sources, and others dated after the entry of the original gag order report that law enforcement sources had declined to comment further, citing the gag order itself. The superior court found that the original gag order actually had impaired "the [intervening news organizations'] ability to obtain information on which to report." The court allowed the news organizations to intervene. And neither Duke nor the State — in this Court or in the superior court — disputed that some persons to whom the modified gag order applies otherwise would be willing to speak with reporters. We are satisfied that WXIA-TV and 13 WMAZ-

9

TV have standing. See id. ("We need not and do not decide whether, in every case, the media must demonstrate the existence of a willing speaker to establish standing . . . because . . . we are satisfied that a willing speaker exists.") See also FOCUS v. Allegheny County Court of Common Pleas, 75 F3d 834, 839 (II) (3d Cir. 1996) (existence of willing speaker evidenced by fact that persons to whom gag order applied had been willing to speak publicly prior to entry of order).

3. We turn now to the merits of this appeal, and we start with a discussion of the standard of review. WXIA-TV and 13 WMAZ-TV urge that we review the modified gag order as a prior restraint, using the standard of review for prior restraints described in Nebraska Press Assn. v. Stuart, 427 U. S. 539 (96 SCt 2791, 49 LE2d 683) (1976). Duke and the State, on the other hand, argue that the modified gag order is not a prior restraint, and it should be reviewed, they say, under the more deferential standard of review set forth in Gentile v. State Bar of Nevada, 501 U. S. 1030 (111 SCt 2720, 115 LE2d 888) (1991). The proper standard to apply is a difficult question. Nebraska Press and Gentile each differ from this case in important ways, and the United States Supreme Court has never decided a case exactly like this one. To complicate matters, in cases like this one, some courts have applied a standard of strict scrutiny consistent

10

with <u>Nebraska Press</u>, some have applied <u>Gentile</u>, and some have applied a third standard (which no party to this case has briefed). In the end, we conclude that it is unnecessary today to decide definitively which standard applies in cases like this one. Even under the most deferential standard, the evidence of record and findings of the superior court cannot sustain the modified gag order.

The modified gag order is a prior restraint of those to whom it applies.[7] Although prior restraints are not unconstitutional in all circumstances, <u>Nebraska Press</u>, 427 U. S. at 570 (VI) (E), they are presumptively unconstitutional. See <u>New York Times Co. v. United States</u>, 403 U. S. 713, 714 (91 SCt 2140, 29 LE2d 822) (1971). Indeed, "prior restraints on speech and publication are the

---

[7] Arguing that it is not a prior restraint, Duke and the State point to <u>Atlanta Journal-Constitution v. State</u>, 266 Ga. App. 168, 168 (2) (596 SE2d 694) (2004), a case in which our Court of Appeals said that a gag order directed only to litigants, their lawyers, and witnesses "cannot be classified as a prior restraint because it is not directed at the media." To be sure, such a gag order is not a prior restraint *of* the media. But it quite clearly is a prior restraint of those to whom it applies directly. See <u>Alexander v. United States</u>, 509 U. S. 544, 550 (113 SCt 2766, 125 LE2d 441) (1993) ("[t]he term 'prior restraint' is used to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur" (citation, punctuation and emphasis omitted)). See also 2 Smolla & Nimmer on Freedom of Speech § 15:42 (2017) ("A statement directed against participants in a judicial proceeding that forbids them, under pain of contempt, from making statements that they would otherwise be free to make certainly *is* a prior restraint." (Emphasis in original)). We disapprove <u>Atlanta Journal-Constitution</u> to the extent that it suggests otherwise. That a gag order challenged by the media is a prior restraint of someone other than the media may affect the degree of scrutiny to be applied — something that we will discuss shortly — but those circumstances do not alter the fact that a gag order is, by definition, a prior restraint of those to whom it applies.

11

most serious and the least tolerable infringement on First Amendment rights." Nebraska Press, 427 U. S. at 559 (V). Accordingly, the proponent of a prior restraint bears "a heavy burden of showing justification for the imposition of such a restraint." Organization for a Better Austin v. Keefe, 402 U. S. 415, 419 (91 SCt 1575, 29 LE2d 1) (1971).

In Nebraska Press, the United States Supreme Court considered the constitutionality of a gag order in a murder case that had attracted widespread news coverage. The gag order applied directly to the media, and as it came before the Supreme Court, it squarely prohibited the broadcast or publication of news reports on three specific topics related to the murder case. See 427 U. S. at 545 (I). The Supreme Court treated the gag order as a prior restraint and indulged a "heavy presumption against its constitutional validity." Id. at 558 (V) (citation and punctuation omitted). To decide whether the presumption had been overcome, the Court explained, it had to determine whether "the gravity of the 'evil,' discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger." Id. at 562 (VI) (citation and punctuation omitted). This analysis, the Court went on to say, required a consideration of the probable extent of pretrial media coverage, the nature of that coverage, and the

12

likely impact of that coverage on potential jurors, see id. at 562 (VI) (A);

whether alternative measures might as effectively mitigate the prejudicial impact

of pretrial coverage, see id. at 563 (VI) (B); and "the probable efficacy of prior

restraint on publication as a workable method of protecting [the accused's] right

to a fair trial," id. at 565 (VI) (C). The Court added that "[t]he precise terms of

the restraining order are also important." Id. at 562 (VI).

Undertaking this analysis, the Court applied exacting scrutiny and

ultimately concluded that the gag order in Nebraska Press was not sustained by

the record:

> The record demonstrates, as the Nebraska courts held, that there was indeed a risk that pretrial news accounts, true or false, would have some adverse impact on the attitudes of those who might be called as jurors. But on the record now before us it is not clear that further publicity, unchecked, would so distort the views of potential jurors that 12 could not be found who would, under proper instructions, fulfill their sworn duty to render a just verdict exclusively on the evidence presented in open court. We cannot say on this record that alternatives to a prior restraint on petitioners would not have sufficiently mitigated the adverse effects of pretrial publicity so as to make prior restraint unnecessary. Nor can we conclude that the restraining order actually entered would serve its intended purpose. Reasonable minds can have few doubts about the gravity of the evil pretrial publicity can work, but the probability that it would do so here was not demonstrated with the degree of certainty our cases on prior restraint require.

13

Id. at 568-569 (VI) (E). Although the Supreme Court in Nebraska Press did not specify the relative weights to be assigned each of the factors, its analysis is consistent with the general understanding that a prior restraint is permissible only if narrowly tailored to avoid a clear and present danger or serious and imminent threat to a competing, protected interest and only to the extent that no alternatives less restrictive than a prior restraint are reasonably available. See, e.g., Levine v. U. S. District Court for Central Dist. of Cal., 764 F2d 590, 595 (IV) (9th Cir. 1985); CBS Inc., 522 F2d at 238. WXIA-TV and 13 WMAZ-TV contend that the standard of exacting scrutiny employed in Nebraska Press is the appropriate standard of review in this case.

Nebraska Press is rightly regarded by prominent commentators as the leading case on "the use of prior restraints in criminal cases," 2 Smolla & Nimmer on Freedom of Speech § 15:29 (2017), but it is unlike our case in at least one important respect. The gag order in Nebraska Press was a prior restraint *of* the media. The modified gag order in the case at bar, on the other hand, does not directly restrain any expression by the media, and it instead is only a prior restraint of lawyers, a defendant in a related case, court personnel, and current and retired law enforcement personnel. This distinction seems

significant. In its discussion of possible alternatives to a prior restraint of the media, the Supreme Court in Nebraska Press made passing reference to a recommendation of the American Bar Association "that trial courts in appropriate cases limit what the contending lawyers, the police, and witnesses may say to anyone." 427 U. S. at 564 (VI) (B). Likewise, in Sheppard v. Maxwell, 384 U. S. 333, 361 (VII) (86 SCt 1507, 16 LE2d 600) (1966), the Supreme Court in dicta identified several means by which a trial court in a case involving extensive media coverage might safeguard the rights of the accused, including by "proscrib[ing] extrajudicial statements by any lawyer, party, witness, or court official which divulged prejudicial matters." Most important, the Supreme Court in Gentile squarely held that "the speech of lawyers representing clients in pending cases may be regulated under a less demanding standard than that established for regulation of the press in [Nebraska Press]." 501 U. S. at 1074 (II) (opinion of Rehnquist, C.J.).[8]

Seizing upon this statement in Gentile, Duke and the State urge that Gentile sets forth the proper standard by which the constitutionality of the

---

[8] Although Chief Justice Rehnquist dissented from the judgment in Gentile, Parts I and II of his opinion were joined by a majority of the Justices and are the opinion of the Court.

15

modified gag order is to be assessed. In <u>Gentile</u>, a Nevada lawyer made extrajudicial, public statements in connection with his representation of a client in a criminal prosecution, and he was disciplined by the state bar for violating a rule that prohibited such a statement to the extent that an attorney "knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding." 501 U. S. at 1033. The lawyer claimed that his discipline (and the rule upon which it was predicated) violated his freedom of speech. Although the Supreme Court ultimately concluded that Nevada had construed the rule so broadly as to render it unconstitutionally vague, see id. at 1048 (III) (opinion of Kennedy, J.),[9] the Court found that the rule on its face did not violate the First Amendment. The Court explained that the "substantial likelihood of material prejudice" standard comports with the First Amendment, inasmuch as "it is designed to protect the integrity and fairness of a State's judicial system, and it imposes only narrow and necessary limitations on lawyers' speech." Id. at 1075 (II) (opinion of Rehnquist, C.J.).

<u>Gentile</u> too, however, differs from our case in a couple of respects that seem significant. To begin, the Supreme Court in <u>Gentile</u> was dealing with a

---

[9] Justice Kennedy delivered the opinion of the Court with respect to Part III.

16

rule regulating the speech of only lawyers, whereas the modified gag order here sweeps more broadly. The decision in Gentile drew heavily upon the long history of extensive regulation of American lawyers as officers of the courts, see id. at 1066 (II) (opinion of Rehnquist, C. J.), and the Supreme Court reasoned that "[l]awyers representing clients in pending cases are key participants in the criminal justice system, and the State may demand some adherence to the precepts of that system in regulating their speech as well as their conduct." Id. at 1074 (II) (opinion of Rehnquist, C. J.). The Court added that, "as officers of the court, court personnel and attorneys have a fiduciary responsibility not to engage in public debate that will redound to the detriment of the accused or that will obstruct the fair administration of justice." Id. (opinion of Rehnquist, C.J.). These statements about officers of the court do not apply so obviously to witnesses, especially only prospective witnesses whom have yet to be subpoenaed or even identified on a witness list. To the extent that the modified gag order is directed to current and retired law enforcement officers who participated in or otherwise have some knowledge of the decade-long investigation into Grinstead's disappearance — many of whom, we suspect, may never be called as a witness in this case — it is not clear that Gentile has any

17

application. Equally significant is that Gentile did not involve a prior restraint, but instead was about discipline imposed for violation of a general rule that limited speech. In the context of the First Amendment, the courts traditionally have distinguished between prior restraints and subsequent punishments, and they usually have subjected prior restraints to more exacting scrutiny. See Nebraska Press, 427 U. S. at 589 (II) (B). Although Gentile certainly suggests that a gag order directed to lawyers would be more commonly permissible than a gag order directed to the media or others, it is not clear that a gag order would be assessed under exactly the same standard as the general rule in Gentile.

Nebraska Press and Gentile both differ from our case in yet another respect, one that the parties have not addressed in their briefing. In both Nebraska Press and Gentile, the restraint of expression was challenged by those to whom the restraint was directed — the media in Nebraska Press and the lawyer in Gentile. Here, however, the modified gag order is challenged by news organizations to which the gag order does not directly apply. Litigants ordinarily are not entitled to assert the constitutional rights of others, see Romer v. State, 293 Ga. 339 (745 SE2d 637) (2013), and although the gag order may amount to a prior restraint as to those to whom it applies, it does not restrain the speech of

WXIA-TV or 13 WMAZ-TV in any way. Although they have standing to challenge the modified gag order, their standing is based on the extent to which it impairs their news gathering, not any impairment of their freedom to speak and publish. Some courts have treated this distinction as a significant one that impacts the standard of review. See, e.g., Dow Jones & Co., 842 F2d at 608-609 ("[W]e conclude that there is a fundamental difference between a gag order challenged by the individual gagged and one challenged by a third party; an order objected to by the former is properly [treated] as a prior restraint, one opposed solely by the latter is not."); State of Montana v. Montana 21st Judicial Dist. Court, 933 P2d 829, 839 (Mont. 1997).

The United States Supreme Court has never passed upon the constitutionality of a gag order that is directed to trial participants and potential trial participants, much less when such a gag order is challenged only by others, and there is significant uncertainty about the standard to be applied in such cases. Cf. E. Chemerinsky, Lawyers Have Free Speech Rights, Too: Why Gag Orders on Trial Participants Are Almost Always Unconstitutional, 17 Loy. L.A. L.J. 311, 313-314 & n.11 (1997) ("No Supreme Court case has addressed the constitutionality of gag orders on lawyers and parties," and "lower courts are

split as to the applicable standard."). Some courts have treated gag orders against trial participants as typical prior restraints and have applied the sort of exacting scrutiny that was employed in Nebraska Press. See, e.g., United States v. Ford, 830 F2d 596, 598 (I) (6th Cir. 1987); CBS Inc., 522 F2d at 238-239; Kemner v. Monsanto Co., 492 NE2d 1327, 1336-1337 (Ill. 1986); Beaufort County Bd. of Ed. v. Beaufort County Bd. of Commrs., 645 SE2d 857, 861 (IV) (B) (N.C. App. 2007). Others have reviewed such gag orders under the "substantial likelihood of material prejudice" standard approved in Gentile. See, e.g., United States v. Brown, 218 F3d 415, 427 (5th Cir. 2000); Atlanta Journal-Constitution v. State, 266 Ga. App. 168, 168-169 (2) (596 SE2d 694) (2004); State of Montana, 933 P2d at 841. Still others have reviewed gag orders challenged by persons to whom the orders do not apply under a "reasonable likelihood of prejudice" standard. See, e.g., Dow Jones & Co., 842 F2d at 610 (III) (A); Radio & Television News Assn. of S. Cal. v. U. S. Dist. Court for Central Dist. of Cal., 781 F2d 1443, 1447 (III) (9th Cir. 1986); Sioux Falls Argus Leader v. Miller, 610 NW2d 76, 86 (S.D. 2000); South Bend Tribune v. Elkhart Circuit Court, 691 NE2d 200, 202 (Ind. Ct. App. 1998). To decide this

20

case, however, we need not definitively determine the standard to be applied.[10]

Even under the most deferential standard — the "reasonable likelihood" standard — the modified gag order fails to pass muster.

4. A reasonable likelihood of prejudice sufficient to justify a gag order cannot simply be inferred from the mere fact that there has been significant media interest in a case. After all, "pretrial publicity — even pervasive, adverse publicity — does not inevitably lead to an unfair trial," Nebraska Press, 427 U. S. at 554 (IV), and "[i]n the overwhelming majority of criminal trials, pretrial publicity presents few unmanageable threats to [the right to trial by an impartial jury]." Id. at 551 (IV). See also Rockdale Citizen Publishing Co. v. State of Ga., 266 Ga. 579, 581 (468 SE2d 764) (1996). Here, although the record shows significant media interest in the case, it does not demonstrate any likelihood that the persons to whom the modified gag order is directed would make prejudicial

---

[10] WXIA-TV and 13 WMAZ-TV ask us to disapprove Atlanta Journal-Constitution to the extent that it adopts the Gentile standard for the review of gag orders directed to trial participants. See 266 Ga. App. at 168-169 (2). Because we need not definitively decide upon the proper standard of review, we decline the invitation. Nevertheless, we caution that, for the reasons set forth in this opinion, there is some reason to doubt the correctness of Atlanta Journal-Constitution. In light of this uncertainty, and because a trial court cannot always know when it enters a gag order whether the order might be challenged by a person to whom it is directed, we think that a prudent trial judge would at least consider the standard described in Nebraska Press before issuing a gag order.

21

statements. We have reviewed the exhibits offered by Duke at the hearing to illustrate the nature and extent of media coverage, and we find no reports attributing inflammatory statements or prejudicial information to sources covered by the modified gag order. Many of the reports purport to have been published after the entry of the original gag order, and they attribute no statements at all to the persons to whom that order applied. Others attribute statements to law enforcement sources that strike us as measured and highly unlikely to produce any prejudice. Most of the reports purport to share information gleaned from arrest warrants and other public and court records. The record certainly does not suggest that any lawyers, court personnel, or law enforcement personnel have disclosed sensitive or confidential information or have attempted to effectively put Duke on trial in a court of public opinion.[11] Cf. United States v. Bowen, 799 F3d 336 (5th Cir. 2015) (new trial required where prosecutors had posted anonymous and prejudicial online comments about the case); Dow Jones & Co., 842 F2d at 610-611 (III) (B) (gag order sustained where record showed a pattern of leaks that amounted to a "shameful abuse of

[11] We note as well that many of the reports among these exhibits are substantially or entirely about the gag order itself, and they say virtually nothing about the merits of the case against Duke.

22

grand jury secrecy"); <u>Sioux Falls Argus Leader</u>, 610 NW2d at 88 (gag order sustained where record showed "volley of accusatory statements" made by parties to the case).

In an effort to show the potential for prejudice, Duke and the State point to the media publication of images that depict Duke shackled and in an inmate uniform. But those images were not obtained from persons to whom the modified gag order applies; they were captured by media photographers in open court. Likewise, Duke and the State point to inflammatory anonymous comments posted in message boards accompanying some of the online media reports. But again, there is no reason to believe that those comments were posted by anyone to whom the modified gag order applies, and the modified gag order would do nothing to stop commentary by anonymous citizens. Finally, we note that some of the reports submitted at the hearing purport to disclose that Duke previously served a sentence in federal prison for theft. Those reports, however, attribute that information to federal authorities, not anyone covered by the modified gag order. Duke and the State fail to identify a single statement attributed to any person to whom the modified gag order applies that would be likely to prejudice Duke's right to a trial by an impartial jury, and we cannot say

23

that the record shows even a reasonable likelihood of prejudice sufficient to sustain a gag order. See In re New York Times Co., 878 F2d 67, 68 (2d Cir. 1989) ("Not only has there been no showing that prejudice may result from statements made to the press by counsel, but there has been no showing that statements are likely to be made at all.").[12] For that reason, the modified gag order is vacated.[13]

Judgment vacated. All the Justices concur, except Peterson, J., not participating.

---

[12] The "reasonable likelihood" standard as articulated by the Second Circuit in Dow Jones & Co. also requires a consideration of the extent to which alternative measures short of a gag order would remedy the reasonable likelihood of prejudice. See 842 F2d at 611 (IV). We note that, although the superior court in this case found no reasonable alternatives to a gag order, we are not sure the superior court gave sufficient consideration to other potential remedies. See Sheppard, 384 U. S. at 352-353 (V). For instance, even if it turns out that Duke is unable to find an impartial jury in Irwin County — which is conceivable, of course, but (based on the record at this point) does not seem certain or even likely — the superior court may have prematurely rejected the idea that a change of venue would be a meaningful remedy. Although the record shows fairly pervasive media coverage of this case in Irwin County and certain other communities in central and south Georgia, and although it shows some media coverage in Atlanta and elsewhere, it does not demonstrate that the media coverage outside central and south Georgia has been pervasive, much less inflammatory or prejudicial.

[13] Although it appears that the superior court intended the modified gag order to supersede the original gag order, the modified gag order does not say so, and we find nothing in the record that vacates or otherwise sets aside the original gag order. To the extent that the original gag order is still in effect, we vacate it as well.

Decided March 5, 2018 — Reconsideration denied March 29, 2018.

Gag order. Irwin Superior Court. Before Judge Cross.

Baker & Hostetler, Stephen D. Bauer, Ian K. Byrnside, Cody S. Wigington, for appellants.

C. Paul Bowden, District Attorney, for appellees.

Holland & Knight, Robert S. Highsmith, Jr., Allen A. Hendrick, amici curiae.