**THIRD DIVISION
ELLINGTON, P. J.,
BETHEL and GOBEIL, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**June 29, 2018**

# In the Court of Appeals of Georgia

A18A0381. CSEHY v. THE STATE.

GOBEIL, Judge.

Following a stipulated bench trial in Cobb County Superior Court, Rand Jason Csehy was convicted of two counts of possession of methamphetamine. Csehy appeals his convictions, asserting that the trial court erred in denying his motion to suppress the results of the blood tests on which the State relied to prove its case. Specifically, Csehy contends that the blood tests at issue resulted from a prior, illegal search of Csehy's urine and were subject to suppression as the fruit of the poisonous tree. For reasons explained more fully below, we agree with Csehy that the court-ordered test of his urine violated his Fourth Amendment rights. We further find, however, that even in the absence of these test results, there existed probable cause

to support the warrant for a search of Csehy's blood. Accordingly, we affirm the denial of Csehy's motion to suppress.

> At a hearing on a motion to suppress, the trial judge sits as the trier of fact. On appeal from the grant or denial of such a motion, therefore, this Court must construe the evidence most favorably to uphold the findings and judgment of the trial court, and that court's findings as to disputed facts and credibility must be adopted unless clearly erroneous.

*Watts v. State*, 334 Ga. App. 770, 771 (780 SE2d 431) (2015) (citation and punctuation omitted). "Although we owe substantial deference to the way in which the trial court resolved disputed questions of material fact, we owe no deference at all to the trial court with respect to questions of law, and instead, we must apply the law ourselves to the material facts." *Hughes v. State*, 296 Ga. 744, 750 (770 SE2d 636) (2015).

The relevant facts are undisputed and show that in September 2014, Csehy was representing a criminal defendant in a case before Cobb County Superior Court Judge Adele Grubbs. Prior to calling the case for trial, Judge Grubbs observed Csehy acting "a little different," in that he seemed unable to sit for any length of time and kept

running in and out of the court room.[1] Before proceeding with trial, Grubbs conducted a bench conference with Csehy and his client; at that time, the judge observed that Csehy was unable to stand without leaning on something, he was sweating profusely, and his eyes were bloodshot. Judge Grubbs began the bench conference by telling Csehy's client, "[Y]ou need to be aware that your lawyer is [currently the] subject of a petition for disciplinary action before the State Bar of the Supreme Court of Georgia. Are you aware of that?"[2] When the client responded affirmatively, Grubbs explained that the disciplinary proceeding could result either in Csehy's voluntary suspension from the practice of law or his disbarment. The client stated that he understood the situation and, in response to a question from Grubbs, stated he wanted to continue with Csehy representing him at trial. Upon hearing the client's response, Grubbs told Csehy, "Mr. Csehy, I've been watching you in the courtroom and I'm

---

[1] It appears from the record that Grubbs had the opportunity to observe Csehy in the courtroom as she dealt with other cases before reaching Csehy's client's case.

[2] Following his 2012 arrest in Fulton County for drugs and firearms violations, Csehy pled nolo contendere in 2014 to two counts of possession of a controlled substance and one count of possession of a firearm during the commission of a crime. *In the Matter of Csehy*, 295 Ga. 853, 853-854 (764 SE2d 540) (2014) ("*Csehy I*"); *In the Matter of Csehy*, 296 Ga. 492 (769 SE2d 93) (2015) ("*Csehy II*"). As a result of these convictions, the State Bar began disciplinary proceedings against him. See *Csehy I*. Csehy was disbarred in 2015. See *Csehy II*.

3

concerned about you and I'm going to have one of the deputies take you down and have a drug test. If you will, please." Csehy began to respond but the judge cut him off, telling him, "You need to go with the deputy." The transcript of the colloquy shows that Csehy then "[left the] courtroom with a deputy."

Several hours later, the judge had another colloquy with Csehy and confirmed that he was continuing to represent the client and was announcing ready for trial. Judge Grubbs then told Csehy, "You know, you haven't been able to stand up without leaning on something. You were a little disheveled, at one point. Your eyes are bloodshot. And that's not a way you come into court. And your drug test tested positive for both cocaine and methamphetamine." Csehy responded that the drug test must be wrong and blamed his disheveled appearance on his car's broken air conditioner. Judge Grubbs replied that Csehy was "in no shape to try a case," at which point Csehy stated, "Judge, I'll take a blood test. I will go take one. . . . [I]n all honesty[,] I don't even have the money to buy food right now." The judge rejected Csehy's request for a blood test, found him in contempt, and sentenced him to five days in the county jail.

The following day, the Cobb County District Attorney's office applied for and obtained a search warrant for Csehy's blood. The affidavit in support of the warrant

4

stated that a Cobb County ADA had gotten onto the elevator with Csehy when he arrived at the courthouse the previous day and noted that Csehy "had a flushed face and watery eyes that [were] unusually wide open" and the ADA had opined that "Csehy appeared to have lacked sleep." The affidavit further stated that Judge Grubbs

> had made assessments of Csehy during the day and she noticed [that he] showed the physical manifestations of drug usage to include: glassy eyes, slurred speech, unusual and erratic speech and thought patterns, short[,] disjointed spoken sentences, profuse perspiration and he also had a ruddy complexion. . . . [Csehy's] appearance was disheveled, he was fidgety, and he constantly leaned or supported himself throughout the day.

Additionally, the investigator averred that Csehy had consented to a urine test, and that the results of that test were positive for methamphetamine and cocaine.

After obtaining the search warrant, the district attorney's office arranged for Sheriff's deputies to transport Csehy from the jail to a local hospital, where Csehy was served with the warrant and where a sample of his blood was drawn. Forensic analysis of Csehy's blood performed at the GBI crime lab showed the presence of methamphetamine.

In December 2014, the State indicted Csehy on a single count each of possession of methamphetamine and possession of chlordiazepoxide (a cocaine

metabolite). Following his arrest, Csehy was granted bond, with one of the conditions requiring him to submit to random drug tests. Csehy's drug tests for January, February, and March 2015 were all positive for methamphetamine. The State thereafter entered a nolle prosequi as to the original indictment and reindicted Csehy on four counts of possession of methamphetamine, based on his blood test results in September 2014 and January, February, and March 2015.

Prior to trial, Csehy filed a motion to suppress the results of the September 2014 blood test and all subsequent blood tests. Csehy argued that all of the blood tests resulted from Csehy's court-ordered urine test, which violated his Fourth Amendment rights. Thus, Csehy contended the blood test results were subject to exclusion as the fruit of the poisonous tree.

Judge Grubbs testified at the hearing on the motion to suppress and stated that on the day in question, Csehy's physical appearance and conduct led her to believe that he was "high as a kite," and that she therefore could not let the trial go forward. And because the client indicated he wanted to proceed with Csehy as his lawyer, the judge felt she needed to order the drug test so she would have grounds for continuing

6

the case.[3] Grubbs acknowledged that she ordered Csehy to take the test and that she required him to go with a deputy so that his urine could be obtained. The judge also conceded that obtaining Csehy's urine constituted a search and seizure within the meaning of the Fourth Amendment. Grubbs explained, however, that she believed she had the authority to order such a warrantless search because, "I have a duty as a judge, a sworn duty as a judge, to preserve the integrity of my courtroom and to make sure the defendant is adequately defended. [The defendant] has a Sixth Amendment right to counsel . . . a Sixth Amendment right to competent counsel."

Charles Lyda, the investigator with the Cobb County District Attorney's office who obtained the search warrant, testified that he was told to get a search warrant for Csehy's blood based on the fact that Csehy's urine had tested positive for illegal narcotics. Lyda explained that before drafting the affidavit he submitted in support of the warrant, he interviewed Judge Grubbs and the prosecutor assigned to Judge Grubbs's courtroom. Additionally, Lyda watched the video from Grubbs's courtroom on the day in question. According to Lyda, he wrote in his affidavit that Csehy had

---

[3] When asked why she didn't continue the case without ordering the drug test, Grubbs responded, "[T]hat's not how you run justice. You know, if you continue the case because a lawyer is high, then lawyers are going to come in the courtroom high."

consented to the urine test because on the video Lyda did not see Csehy protesting the order to go and take the test.

Csehy testified that he did not consent to the seizure of his urine and that he believed he was under court order to submit to the test. Csehy explained that a deputy escorted him to the test, keeping his hand on Csehy's elbow to make sure Csehy "wouldn't run off." The deputy also escorted Csehy to the restroom to obtain the sample and then escorted Csehy back to the courtroom.

Following the hearing, the trial court entered an order denying the motion to suppress. The court found that Csehy did not consent to the urine test and that the warrantless test was not justified by exigent circumstances. Nevertheless, the court concluded that the urine test did not violate Csehy's Fourth Amendment rights, reasoning:

> In requiring [Csehy] to submit to a urine test, Judge Grubbs acted within the inherent powers of the judiciary. *The test was not sought to further a criminal investigation*; rather, it was to determine whether the conduct of defendant before the court violated the rules of the court and impeded the administration of justice. This court finds that Judge Grubbs had the authority to require [Csehy] to submit to a urine test.

(Emphasis supplied.) The court further found that even in the absence of the results of the urine test, probable cause supported the issuance of the search warrant for Csehy's blood. The court stated that the observations of Judge Grubbs and the ADA set forth in the affidavit, together with "Lyda's own observations from watching" the video of Csehy on the day in question (including Csehy's "offer to submit to a blood test") provided sufficient probable cause for the search warrant.

After the motion to suppress was denied, Csehy proceeded to a bench trial on counts one and two of the indictment.[4] The parties stipulated as to all of the facts established at the motion to suppress hearing, venue, the positive results of drug tests Csehy underwent in January, February, March, and April 2015, and the chain of custody of all urine and blood specimens. Additionally, the trial court found, and the State agreed, that if the September 2014 blood test was found inadmissible on appeal, then the results of all subsequent blood tests would have to be suppressed as the fruit of the poisonous tree. After the close of the evidence, the trial court found Csehy guilty of both counts and entered a judgment of conviction, sentencing Csehy to three

---

[4] The State entered a nolle prosequi as to counts three and four of the indictment.

years' probation on each count, with the sentences to run consecutively. This appeal followed.

The current case requires us to decide two questions. First, we must determine whether Csehy's court-ordered urine test violated his constitutional rights. If that search did violate the Fourth Amendment, we must then determine whether, in the absence of the results of that test, the search warrant for Csehy's blood was supported by probable cause.

1. The Fourth Amendment to the United States Constitution protects an individual's right to be free of unreasonable searches and seizures, and this protection extends to the "compelled withdrawal of blood, breath, and other bodily substances." *State v. Williams*, 337 Ga. App. 791, 795 (788 SE2d 860) (2016) (citation and punctuation omitted). See also *Skinner v. Railway Labor Executives' Ass'n*, 489 U. S. 602, 617 (109 SCt 1402, 103 LE2d 639) (1989) (the collection of a urine sample constitutes a search under the Fourth Amendment); *Williams v. State*, 296 Ga. 817, 819 (771 SE2d 373) (2015). As a general rule, our law recognizes only two types of Fourth Amendment searches: those conducted pursuant to a search warrant and those conducted without one. *Williams*, 296 Ga. at 819. A warrantless search is presumed invalid, and it is the State who bears the burden of rebutting this presumption. Id. The

10

State can meet this burden by showing that the search falls into one of the "specifically established and well-delineated exceptions" to the warrant requirement. Id. Here, however, the trial court specifically found that no such exception to the warrant requirement applied to Csehy's urine test.[5] Instead, the trial court relied on the "inherent powers" of the judiciary to find that the warrantless search was legal.

Although the trial court's order does not identify the legal authority on which it was relying, the Supreme Court of Georgia

> has long recognized the inherent power of the judiciary. When the Constitution declares that the legislative, judicial[,] and executive power shall forever remain separate and distinct[,] it thereby invests those

---

[5] The trial court found that the State had failed to prove either of the two exceptions that might have applied under the circumstances of this case, those being consent and exigent circumstances. The State does not challenge this finding on appeal, and relevant law supports the trial court's ruling on this issue. See *Williams*, 296 Ga. at 821 ("the natural metabolization of alcohol in a person's bloodstream [does not] constitute[] an exigency justifying an exception to the fourth amendment's search warrant requirement for nonconsensual blood testing and all DUI cases"), citing *Missouri v. McNeely*, 569 U. S. 141 (133 SCt. 1552, 185 LE2d 696); *Schneckloth v. Bustamonte*, 412 U. S. 218, 228 (II) (B) (93 SCt 2041, 36 LE2d 854) (1973) (for a warrantless search to be valid under the consent exception, that consent may not be "coerced, by explicit or implicit means, by implied threat or covert force"); *Kendrick v. State*, 335 Ga. App. 766, 769 (782 SE2d 842) (2016) ("[m]ere acquiescence to the authority asserted by a [state] officer cannot substitute for free consent") (citation and punctuation omitted).

11

officials charged with the duty of administering justice with all necessary authority to efficiently and completely discharge those duties.

*Judicial Qualifications Comm'n v. Lowenstein*, 252 Ga. 432, 433 (1) (314 SE2d 107) (1984) (citation and punctuation omitted). Additionally, "[t]he courts have an inherent power to regulate the conduct of attorneys as officers of the court, and to control and supervise the practice of law generally, whether in or out of the court." *Villanueva v. First Am. Title Ins. Co.*, 292 Ga. 630, 635 (740 SE2d 108) (2013) (citation and punctuation omitted). And Georgia statutory law empowers each court in the state

> [t]o preserve and enforce order in its immediate presence . . . to prevent interruption, disturbance, or hindrance to its proceedings; . . . [t]o compel obedience to its judgments, orders, and process and to the orders of a judge out of court in an action or proceeding therein; [and] [t]o control, in the furtherance of justice, the conduct of its officers and all other persons connected with a judicial proceeding before it, in every matter appertaining thereto . . . .

OCGA § 15-1-3 (1), (3), (4). Georgia statutory law also provides courts with the power to punish contempt. See OCGA § 15-1-4; OCGA § 15-6-8 (5).

Relying on this authority, the State argues that a judge seeking to preserve order, administer justice, or control the conduct of the court's officers and proceedings has the inherent authority to order a Fourth Amendment search even in

12

the absence of a warrant or any of the well-established exceptions to the warrant requirement. Put another way, it is the State's position that a trial judge exercising his or her inherent powers during the course of judicial proceedings is not constrained by the Fourth Amendment. We disagree.

As with other branches of government, the inherent powers of the judiciary to fulfill its duties are limited by the Constitution. This Court has long recognized that

> "[t]he discretion of the trial judge in regulating conduct of counsel, parties, and the witnesses, and in prescribing the manner in which the business [of the court] shall be conducted, . . . is broad and . . . enable[s] [the judge] in any case to effect the purposes for which [the power] is inherently [vested in the judge]; but [the judge's power] is not unlimited, for it must not be abused and it may not be exercised in such a way as to involve a deprivation of a right." *Loomis v. State*, 78 Ga. App. 153, 163 (51 SE2d 13) (1948).

*Smith v. State*, 150 Ga. App. 498, 499 (258 SE2d 167) (1979). Thus, a court's inherent "'power to control the proceeding of the court is subject to the proviso that in so doing a judge does not take away or abridge any right of a party under the law.'" *State v. Perry*, 261 Ga. App. 886, 887 (583 SE2d 909) (2003), quoting *State v. Colquitt*, 147 Ga. App. 627, 628 (249 SE2d 680) (1978). Accordingly, even in the course of controlling judicial proceedings or officers of the court, a trial judge may

13

not act so as to interfere with the First Amendment rights of trial participants (parties, counsel, and witnesses) or the media. *WXIA -TV v. State*, ___ Ga. ___ (811 SE2d 378) (2018). Nor may a court exercise its control of the courtroom to infringe upon the defendant's Sixth Amendment rights to a public trial, *Jackson v. State*, 339 Ga. App. 313 (793 SE2d 201) (2016), or to self-representation, *Burney v. State*, 244 Ga. 33, 36-37 (2) (257 SE2d 543) (1979). It follows, therefore, that in exercising its inherent power to control the proceedings and parties before it, a court may not order a warrantless Fourth Amendment search that does not otherwise fall within one of the well-established exceptions to the warrant requirement.[6] See *Burney*, 244 Ga. at 37 (2) ("the power of the trial court does not extend so far as to cause an absolute deprivation of [a] constitutional right"). In light of this fact, and given the trial court's unchallenged finding that the search did not fall within an exception to the warrant

---

[6] Neither of the two primary cases relied on by the State support a conclusion that the Fourth Amendment does not apply to courtrooms. See *Byrd v. Hopson*, 265 FSupp2d 594, 608 (III) (D) (W. D. N. C., 2003) (finding that a judge-ordered patdown of a litigant for weapons was the equivalent of a *Terry* stop, given that the judge was aware of specific facts that led him to believe the litigant was armed); *State v. Shelton*, 270 SC 577, 579 (243 SE2d 455, 459) (S. C. 1978) (judge-ordered patdown of a party to a foreclosure action was justified based on reliable information that the litigant carried a gun and had threatened to kill people, including a local attorney). As the *Byrd* court noted, a *Terry* patdown represents one of the well-defined exceptions to the Fourth Amendment's warrant requirement. 265 FSupp2d at 608 (III) (D).

14

requirement, we find that Csehy's court-ordered urine test constituted an unlawful search under the Fourth Amendment.

2. We now turn to whether, in the absence of the urine test results, probable cause supported the issuance of the search warrant for Csehy's blood.

When determining whether probable cause for a search warrant exists, a magistrate is required to make "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found" in the place to be searched. *Prince v. State*, 295 Ga. 788, 792 (2) (a) (764 SE2d 362) (2014). See also *Illinois v. Gates*, 462 U. S. 213 (103 SCt 2317, 76 LEd2d 527) (1983). And we bear in mind that a "fair probability" refers to a standard on which "'reasonable and prudent people, not legal technicians, act'." *Caffee v. State*, ___ Ga. ___ (2) (Case No. S17G1691, decided May 7, 2018), quoting *Florida v. Harris*, 568 U. S. 237, 243-244 (133 SCt 1050, 185 LE2d 61) (2013).

"A magistrate's decision to issue a search warrant based on a finding of probable cause is entitled to substantial deference by a reviewing court." *Prince*, 295 Ga. at 792 (2) (a). "Even doubtful cases should be resolved in favor of upholding a

magistrate's determination that a warrant is proper." Id. We therefore review a magistrate's decision to issue a search warrant using the same "totality of the circumstances analysis" applied by the lower court, *Bryant v. State*, 288 Ga. 876, 892 (13) (a) (708 SE2d 362) (2011), "to ensure that the [magistrate] had a substantial basis" for finding the existence of probable cause, *Banks v. State*, 277 Ga. 543, 545 (2) (592 SE2d 668) (2004). In conducting this review, we are limited to the information available to the magistrate. Thus, even if additional evidence of probable cause is presented at the motion to suppress hearing, we cannot consider that evidence if it was not also presented to the magistrate, either by way of the officer's affidavit or by supplemental testimony provided by the officer seeking the warrant. *Lyons v. State*, 258 Ga. App. 9, 10 (1) (572 SE2d 632) (2002) (in determining whether a magistrate had a substantial basis for finding probable cause, "we may consider only information that was presented to the [magistrate], not additional evidence that may have emerged at the motion to suppress hearing or trial"). See also *Galloway v. State*, 332 Ga. App. 389, 392, n. 3 (772 SE2d 832) (2015) ("it is . . . clear that neither this Court nor the trial court can consider information that was not made available to the [magistrate] who issued the warrant").

16

In assessing whether the affidavit in this case supported a finding of probable cause, we begin by noting there was evidence presented at the motion to suppress hearing that was not set forth in the affidavit. For example, Lyda testified at the hearing that he had conducted an independent review of the videotapes from Judge Grubbs' courtroom on the day in question. Lyda also stated that in his opinion, the description of Csehy's physical symptoms given by both Judge Grubbs and the ADA were "indicative of alcohol or drug use or substance use." Lyda further testified that when he watched the videotapes, he observed Csehy "request a blood draw." Additionally, there was significant evidence presented at the motion to suppress hearing regarding Csehy's history of drug use and the fact that his substance abuse problems had led to disciplinary proceedings before the State Bar and, ultimately, to Csehy's disbarment.

Although the trial court relied on all of the foregoing facts to find that the warrant was supported by probable cause, none of these facts were set forth in Lyda's affidavit, and there is no evidence that they were provided to the magistrate. Specifically, although Lyda averred as to his own experience and training in drug investigations, there is no evidence that he informed the magistrate either that he had reviewed the videotapes of Csehy from the day in question or that in his opinion, the

17

videos showed that Csehy appeared to be under the influence of any substance.[7] Nor did Lyda state that Csehy had requested a blood draw. Finally, there was no reference in the affidavit to the fact that Csehy was known to use illegal narcotics.

In addition to the facts that were not included in the affidavit, Lyda also made several misstatements when applying for the warrant. Lyda averred that during the bench conference with Csehy and his client, Judge Grubbs asked the client if he was aware that Csehy "had been arrested [on] drug charges." The judge, however, only asked the client if he was aware that Csehy had disciplinary proceedings pending against him; she never mentioned Csehy's known or possible drug use to the client. Lyda also stated that Csehy had consented to Judge Grubbs' request that he take a urine test. The record, however, shows that the judge ordered Csehy to submit to that test.

Where an affidavit contains material misstatements or omissions, "the false statements must be deleted, the omitted truthful material must be included, and the

---

[7] See *Galloway v. State*, 332 Ga. App. 389, 391 (772 SE2d 832) (2015) ("[t]estimony from a motion to suppress may supplement the four corners of an affidavit in order for a trial court to determine *what the magistrate knew at the time of the issuance of with the warrant*) (citation and punctuation omitted, emphasis supplied). Here, Lyda did not testify at the motion to suppress hearing that he had explained to the magistrate that he had personally reviewed the videotapes in question.

affidavit must be reexamined to determine whether probable cause exists to issue a warrant." *Sullivan v. State*, 284 Ga. 358, 361 (667 SE2d 32) (2008) (citation and punctuation omitted). Similarly, "[i]f an affidavit supporting an application for a search warrant contains information which is in part unlawfully obtained, the validity of a warrant to search depends on whether the untainted information, considered by itself, establishes probable cause for the warrant to issue." *State v. Kaulbach*, 331 Ga. App. 610, 614 (1) (771 SE2d 245) (2015). Here, the affidavit submitted by Lyda stated both that Csehy had consented to a test of his urine and that the test had been positive for illegal narcotics. Given that Csehy did not consent to the urine test and that the test itself was illegal, we must view the affidavit without those statements. We must also strike from the affidavit Lyda's statement that Judge Grubbs questioned Csehy's client regarding the attorney's arrest on drug charges. The question is then whether the remaining information in the affidavit would lead a reasonable person to believe that evidence of a crime probably would be found in Csehy's blood. See *Jones v. State*, 292 Ga. 656, 664-665 (740 SE2d 590) (2013).

In the absence of the positive urine test results or any other indication that Csehy was a known drug user, the information provided to the magistrate included Lyda's summary of his interviews with Judge Grubbs and the ADA regarding their

19

direct observations of Csehy. First, Judge Grubbs observed Csehy in the courtroom fidgeting excessively and "leaning or supporting" himself throughout the day. The judge further observed that Csehy's speech was slurred and "unusual and erratic," that he spoke in "short, disjointed" sentences, and that he exhibited "erratic thought patterns." In Judge Grubbs's opinion, Csehy's appearance and conduct constituted "physical manifestations of drug [use]." Further, the ADA had observed Csehy come to court to represent a client looking disheveled and as though he "lacked sleep." Additionally, the ADA noted that Csehy a flushed face and his eyes were watery and "unusually [wide] open"

We acknowledge that the admissible evidence contained in Lyda's affidavit could be described as somewhat thin. We emphasize, however, that "substantial deference must be accorded a magistrate's decision to issue a search warrant based on a finding of probable cause." *State v. Palmer*, 285 Ga. 75, 77 (673 SE2d 237) (2009). This substantial deference furthers "the Fourth Amendment's strong preference for searches conducted pursuant to a warrant." *Palmer*, 285 Ga. at 77 (citation and punctuation omitted). See also *Georgia v. Randolph*, 547 U. S. 103, 117 (II) (D) (126 SCt 1515, 164 LE2d 208) (2006) (in general, the law is partial "toward police action taken under a warrant as against searches and seizures without one")

20

(citation and punctuation omitted). Thus, "[a]lthough in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded warrants." *Palmer*, 285 Ga. at 77-78.

Here, the affidavit demonstrated that Csehy was exhibiting a wide range and number of symptoms, all of which were consistent with the use of illegal substances. Moreover, the circumstances presented to the magistrate included the fact that the affidavit was sought by an investigating officer with significant training and experience in the area of narcotics.[8] See *Diaz v. State*, 344 Ga. App. 291, 302 (810 SE2d 566) (2018) (finding probable cause supported warrant for blood of driver suspected of DUI and noting that officer making the warrant request averred that he had been in law enforcement for 15 years, had served four years on a DUI task force that "focused on impaired driving," and had "participated in over 400 traffic stops based on suspicion of impaired driving"). Additionally, the magistrate was entitled to give substantial weight to the fact that Judge Grubbs had observed Csehy for

---

[8] Lyda averred that he had been a law enforcement officer since 1997, that he was POST certified, that he had received specialized, formal training in several areas, including drugs, and that he was a "court certified 'expert' on topics related to Criminal Street Gangs."

several hours and was of the opinion that Csehy's behavior indicated the use of illegal narcotics. See *Palmer*, 285 Ga. at 79 (one of the circumstances to be considered by a magistrate assessing probable cause is the "veracity, reliability, and basis of knowledge" of persons supplying information to support the warrant) (citation and punctuation omitted); *Cochran v. State*, 281 Ga. 4, 5 (635 SE2d 701) (2006) (same).

Applying the deferential standard of review owed a magistrate's findings of probable cause, we find that these circumstances, taken together with the number and range of Csehy's physical manifestations suggestive of drug use as set forth in the affidavit, would lead a reasonable person to conclude that the use of illegal narcotics by Csehy "was an equally or more probable explanation" for Csehy's appearance and conduct than any explanation that did not involve illegal drug use. *Hughes v. State*, 296 Ga. 744, 750 (770 SE2d 636) (2015) (noting that "we do not consider any fact or circumstance standing alone"). Accordingly, we must conclude that the magistrate had a substantial basis for finding probable cause in this case.

Because the blood draw was supported by a valid warrant, the trial court did not err in denying Csehy's motion to suppress the results of his blood tests. We therefore affirm the denial of Csehy's motion for new trial.

22

*Judgment affirmed. Ellington, P. J., concurs. Bethel, J., concurs fully and specially.*

A18A0381. CSEHY v. THE STATE.

BETHEL, Judge, concurring fully and specially.

I concur fully.

I write separately, because I believe this record supports the warrant in an additional manner. The record reflects that the magistrate, before issuing the warrant, heard "oral testimony, given under oath, received and recorded" and marked the application for the search warrant accordingly. Unfortunately, the record before us does not contain a transcript or other record of that testimony. Accordingly, the magistrate may have heard the evidence considered at the motion to suppress or other unidentified evidence supporting the warrant and, absent a record showing otherwise, I believe we must presume that he did. The burden to show error is on the appellant and the failure to secure a record sufficient to do that results in a presumption that what transpired in the absent portion supports the decision of the court below. *See Keegan v. State*, 221 Ga. App. 487, 487 (1) (472 SE2d 107) (1996) (Allegations in

an appellate brief are no substitute for a transcript, and "[a]bsent a transcript, the court can only presume that this portion of the trial was conducted in a regular and proper manner.").